Joseph I. Mitchell, Plaintiff-Appellee, v. Four States Machinery Company, a Corporation, and Federal Press Company, a Corporation, Defendants.
Appeal of Federal Press Company, a Corporation, Certain Defendant-Appellant.

Gen. No. 49,534.

First District, Fourth Division.

August 1, 1966.

Rehearing denied September 8, 1966.

Vogel & Vogel, and Jerome F. Dixon, of Chicago (Leslie H. Vogel and David F. Holland, of counsel), for appellant.

Irving J. Siegal and Robert W. Rooney, of Chicago, for appellee.

MR. JUSTICE ENGLISH delivered the opinion of the court.

This is an appeal from a jury verdict and judgment against Federal Press Company * for $255,000 as damages for personal injuries sustained by plaintiff while working as a punch press operator for Central Die Casting Company.

Defendant manufactured and delivered to Central Die Casting Company, on December 27, 1956, a one-hundred ton punch press, completely wired and assembled, to be used to stamp metal television frames. The press was installed for operation sometime in January 1957, by employees of Central. The press operated without inci-

---

* In a previous trial, which had resulted in a mistrial as to defendant Federal, there was a directed verdict in favor of the other defendant, Four States Machinery Company.

dent for almost five years, except for a fire in the electrical control box in 1961, which is without significance in this case.

Plaintiff was employed as a punch press operator for Central and had operated the press in question on various occasions over a period of approximately four years up to the time of the accident. On October 3, 1961, after performing his work as usual for approximately two hours that morning, plaintiff left the press for a coffee break while a substitute continued its operation. Plaintiff returned ten minutes later and proceeded to punch out three television frames. He placed the fourth frame on the punch press, hit the motivating buttons and the ram of the press came down and went up. Plaintiff reached into the bed of the press in customary fashion to remove the stamped frame from the die, when the ram came down again, and then kept going up and down continuously. Woodson, a fellow employee working next to plaintiff, ran to the press and turned the switch, halting the continuous operation of the ram. Both arms of plaintiff had been severed below the elbows.

Analysis of the operation and composition of the selector switch block on the press in question is a prerequisite to determination of the merits of this case. The operation of the selector switch is controlled by a knob on the front of the block, which may be turned right or left (either clockwise or counterclockwise) from one to another of three different positions. The knob actuates a cam which in turn causes a simple metal crossbar to move either right or left, depending on which way it is turned. The cam is basically a circular piece of plastic with inclined planes across its surface. These inclined planes allow the crossbar to move to different positions of rest on the cam. Each position on the cam represents a different operation of the press. There is a name plate, or dial, attached to the outside of the

selector switch which has three words on it signifying the three different operations: "once," "inch" and "continuous." When functioning properly, with the selector switch at the "once" position, the ram would move in a single down-and-up stroke and stop; at the center "inch" position the ram would move only so long as the operator would hold down both of two control buttons, and would stop on release of either; at the "continuous" position the ram would move down and up continuously.

Over objection by defendant, a photocopy of a wiring diagram or blueprint, the original of which was delivered by defendant with the machine, and subsequently destroyed, was admitted in evidence as a plaintiff's exhibit. The wiring of the switch determines the operation of the machine, and if the switch were properly wired in accordance with the diagram, the dial of the switch would correctly register the operation in which the press was engaged. (For present purposes it is assumed that the switch was not wired for the *inch* operation at all.) When the selector switch, the diagram, and the experts' testimony are analyzed it appears that tabs 1 and 24 were to be wired to the front terminals, while tabs 1 and 25 were to be wired to the rear terminals. Under this wiring arrangement, when the electrical connection was made to the rear terminals, a *continuous* operation would result. At such a time the crossbar would be at the highest position on the cam. If, for any reason, the crossbar were to slip from this position, a spring load device would cause the crossbar to fall to the lowest position on the cam, a *once* operation would result, and the machine would stop. This was a safety feature of the control, because under such an arrangement any slipping from position by the crossbar would have been to the *once* position. Obviously, an operator standing clear of the machine for an expected *continuous* operation would not be injured by an unexpected stopping of the ram. If the wiring were correctly done in accord-

65

ance with the diagram, the *once* operation would have occurred when the crossbar was in the lowest position on the cam and any slipping of the bar while in that position would therefore have had no effect on the operation of the machine; by slipping from the *once* position the crossbar could not have engaged the *continuous* operation, because to do so would require it to move upward to the highest position on the cam, which it could not do against the force of gravity and against the opposite pressure of the spring.

The gist of defendant's negligence, as alleged by plaintiff, is the faulty wiring of one of the selector switch blocks. Specifically, it is claimed that tabs 1 and 24 (the *once* cycle) were incorrectly wired to the rear terminals instead of the forward terminals, and tabs 1 and 25 (the *continuous* cycle) were incorrectly wired to the forward terminals. This meant that when the control knob pointed clockwise to "continuous" the machine operated in the "once" cycle, and vice versa. The net result of such "reversed" wiring was to remove the safety feature otherwise present if wired according to defendant's diagram. Under proper wiring, a slight release of the switch block spring pressure could only cause the electrical connection to produce a *once* operation and stop the machine, whereas, under the alleged miswiring, if the spring pressure were released, the press would cycle *continuously*. Moreover, such "reverse" wiring allegedly caused extensive spring tension in the switch block through customary use in the *once* operation and made it inherently and potentially dangerous to an operator of the press. Such wiring allegedly made it inevitable, after an extended period of operation, that the cam would become worn and, by slippage of the crossbar, would cause a sudden and unexpected change in the operation from the *once* cycle to the *continuous* cycle. As a further argument pointing toward defendant's negligence, plaintiff contends that proper wiring

of the *inch* position on the selector switch (which, it is agreed, was omitted entirely from the switch in question) would have served as an additional safety factor since, even under "reversed" wiring of the *once* and *continuous* operations, release of the spring pressure would have resulted in the movement of the crossbar only so far as the middle or *inch* position on the cam, a position of safety.

Defendant contests the issue of liability only. It contends that plaintiff failed to prove his case, and that defendant's motions for directed verdict and for judgment notwithstanding the verdict should have been allowed. Alternatively, defendant claims that the verdict was contrary to the manifest weight of the evidence and that there were trial errors requiring a new trial.

Four witnesses employed by Central testified on behalf of plaintiff concerning the press: Woodson, Rudle, Cesky and the plaintiff himself.

**Testimony of plaintiff**

He started working for Central in 1955 as a punch press operator. When he operated the press in question he would put the television frames in the die, take a hose and blow clean the top of the die and oil it, set the frame on the die, and then, using both hands, press both of the activating buttons at one time to cause the ram to come down. If he took either hand off one of the buttons the ram would not move. On the day of the accident, the pointer on the dial of the switch was pointed to the right, as it had been at all times when he operated the press in question. He never saw the pointer in any other position. Immediately before the accident he pressed the two buttons and the ram came down and went back up and stayed. He reached in with both hands to take the television frame off the die and put it on the inspector's table. This required him to put both hands and arms inside the die. He thought he had the frame in his hands until he looked down and saw

that his arms were cut off. He then realized that the ram was going up and down continuously.

(On cross-examination) During all his previous work on the press it had operated properly, and to his knowledge it was the best press in the plant, although he was not a technician and had nothing to do with repairs.

(A significant point in plaintiff's testimony is that at the time of the accident the switch was pointed to the right in the position which indicated "continuous" but which, according to plaintiff and others, had always produced a "once" cycle operation. It is undisputed that another employee stopped the action of the ram by turning the switch, and when the switch was removed from the press it was pointed to the right. The inescapable inference is that the sudden change in operation of the ram was caused by a movement of the switch from right to left. The parties differ, however, in their theories as to how this came about.)

### Testimony of Oscar Woodson

At the time of the accident he was employed by Central as a die caster and was molding television frames. He was working at the punch press next to plaintiff. Upon his return from the 10:00 a. m. coffee break, he heard plaintiff cry out, whereupon he stood up and saw the ram of the press going up and down. Plaintiff was swinging his arms which were "hanging by the skins." Woodson turned the press off by turning the switch, although he didn't know which way he turned it. He was not employed by Central at the time the press was delivered to the plant by defendant. Woodson had operated the press in question when the regular operators were not there. On those occasions the press had operated all right.

### Testimony of Emil Rudle

He worked for Central for twenty-nine years as a punch press operator. When the press in question was delivered by defendant, he helped Paul Michelek, the die

setup foreman, set a die in the press. (Michelek was not living at the time of trial.) Rudle's testimony was somewhat confused as to the date when the die was set. On direct examination he testified that it was set in January of 1957, while on cross-examination he indicated that the date was December of 1957. Since the record indicates that the press was delivered to Central in December 1956, it would appear that the December 1957 date was in error. In any event, we do not consider the discrepancy to be of any consequence. There seems to be no question but that Rudle helped set the first die in the press.

Rudle further testified that, with the dial of the selector switch set at *inch*, the press would not operate; the ram would not move down. With the dial of the selector switch set to the extreme right at *continuous*, the press did not operate continuously but instead the ram performed the *once* operation, moving down and up only once before stopping. When he turned the selector switch so that the dial showed *once*, the press performed a continuous operation. After this initial test and at all times when he operated the press, he never had occasion to require a continuous operation; he thereafter never touched the switch.

**Testimony of Rudolph Cesky**

Cesky was the maintenance foreman employed by Central at the time of the accident. He helped install the press early in January 1957, at which time there was no die set in it. He first put an electrical line into the press to energize the box and motor. He alone performed all electrical work on the press from its delivery through the date of the injury to plaintiff. On direct examination Cesky testified that upon delivery of the press, he inspected it simply by starting and stopping the motor to see that it ran in the right direction. He and Michelek ran the press down and up only once. He never changed the selector switch on the press in ques-

tion after its delivery. The selector switch, introduced in evidence as a plaintiff's exhibit, was the same switch that was taken off the press after the accident. He didn't know whether the *inch* position on the selector switch was "hooked up." On further direct questioning, however, he stated that the wires were there but it was not hooked up in the switch and the machine did not work in *inch* position.

On cross-examination Cesky said that it was his job to install the press and determine whether it was in operating condition. At installation all he did was to get power into the machine to see if it ran the right way. The selector switch was set at the *once* phase and he did not change it, operating the machine through only one cycle down and up. He made no other tests, and did not try the press on the *inch* setting. Confronted with his pretrial deposition, Cesky then testified that he had tested the press on both the *once* and the *inch* settings, but not when set at *continuous*. He believed at that time that the press was operating properly. Again, after a short in the transformer in May of 1961, he tested the control switch on *inch* and *once*. It functioned properly and there had been no damage done to it. The selector switch in evidence was the one on the press when delivered and had not been removed until after the accident.

Further on cross-examination Cesky said that if the switch was not wired in the *inch* position the ram would nevertheless function by "inching" down if the operator's hands were held on the buttons. This, he said, was what happened when he and Michelek tested the press. The ram functioned according to the dial at the *inch* and *once* positions. While he didn't open the switch box, he observed the part of the wiring on the posts which stuck out of the box and did not find it improper, although he did not know whether it was the way it should have been. He explained that when he had said

on direct examination that at the time of installation the wires to the *inch* position were not connected, he was referring to the fact that "there was one wire still off in the box and taped up."

**Testimony of John Blair**

He is an Associate Professor of Mechanical Engineering at the Illinois Institute of Technology and was called as a witness on behalf of plaintiff. His qualifications to testify as an expert were essentially unchallenged.

Blair took apart and examined the selector switch which had been removed from the press in question. He then proceeded to describe its function and operation in great detail. The operation is controlled manually by a knob on the outside of the front part of the switch, which knob may be turned to either right or left positions. The knob is fastened to and thus controls the movement of a cam, which is a circular device with inclined planes across its surface upon which a metal crossbar rests. As the knob is turned, the crossbar rides up or down the inclined planes until it reaches a detent position, or depression in the surface of the cam, into which it falls and holds until actuated further. In full clockwise position the switch connects up the rearmost terminals (identified as terminals 1 and 24) and in the counterclockwise position it connects up the forwardmost terminals (identified as terminals 1 and 25).

The name plate on the switch indicates three positions for the knob: "once," at the full counterclockwise setting; "inch," at the center setting; and "continuous," at the full clockwise setting. The wiring diagram in evidence indicates that at the *once* position terminals 1 and 24 would be connected, and at the *continuous* position terminals 1 and 25 would be connected. On the switch itself, however, the wiring was exactly opposite. When the knob pointed to *once,* terminals 1 and 25 were connected and such a connection would cause a *continuous* operation of the machine. Conversely, when the knob

71

of the switch pointed to *continuous,* terminals 1 and 24 were connected, resulting in operation of the machine on the *once* cycle.

When the knob of the switch was in the full counterclockwise setting, the crossbar was at its lowest position, and, conversely, when the knob was in the full clockwise setting, the crossbar was at its highest position. Because of spring pressure, the knob of the switch would not turn from the counterclockwise to the clockwise position of its own accord, but would require the application of some force to overcome the pressure of the spring. If, however, the knob were to be released or turned even slightly from its detent position at the full clockwise setting, it would fall back into the full counterclockwise setting of its own accord.

The plastic cam had become worn in the detent portion at its highest level, indicating that this position on the cam had been subject to considerable use. It was at this position on the cam that the press would operate in a *once* cycle although the knob would be in the full clockwise setting, indicating "continuous."

The selector switch could not be placed in the "inch" position and result in an inching of the press, nor could the press be "inched" in the "once" position. The switch would have to be taken apart and reassembled differently to function in three positions instead of two. This could be done without additional parts. The wiring diagram in evidence indicated a position for "inch," but did not show any wiring hookup for the *inch* operation. The switch therefore had only two operating positions, "once" and "continuous."

**Testimony of Burgess Jennings**

He is a Professor of Mechanical Engineering and Associate Dean at the Technological Institute of Northwestern University. He was presented as an expert witness on behalf of defendant, and his qualifications were not questioned.

Jennings, like Blair, described in detail the make up and operation of the selector switch in question, making reference to the exterior knob, its different positions on the dial, the location of connector points 1 and 24, and 1 and 25, and their functions. He also described the cam and the crossbar, or pin, and their relationship to each other in three different positions. He noted, however, that on both the switch itself and on the wiring diagram there was no circuitry in between the front and rear points, and therefore no wiring for the middle or *inch* position. He further stated that the wiring diagram showed terminal 24 connected to the *once* position and terminal 25 to the *continuous* position. In all of this explanation the testimony of Jennings was consistent with that of plaintiff's witness Blair.

Jennings also pointed out, as had Blair, that the switch could be taken apart and reassembled so as to operate in three, rather than two, positions. Jennings further stated that in a reassembling of the switch in a two-position operating condition, the cam could be turned ninety degrees so as to reverse the location of the highest and lowest crossbar positions on the cam, and thus to reverse the *once* and the *continuous* cycles as designated on the knob dial.

When he took the switch apart he found spicules of metal adhering to the plastic part of the switch front, and he noticed that a portion of the switch front had been broken off inside.

**Testimony of Robert Noyes**

He is employed by defendant as an engineer but does not have an engineering degree.

The switch on the press in question at the time of its delivery to Central was an Arrowhart-Hegeman three-position selector switch. When he saw the press on the day after the accident, the contact block of the switch was an Arrowhart but the actuating control knob of the switch was made by Allen-Bradley. Noyes said,

73

however, that normally the control parts made by two different manufacturers are interchangeable and can be used with the same contact block. So far as he could see there was no difference between the Arrowhart and the Allen-Bradley control knobs.

The switch in evidence (being the same one examined by the expert witnesses) was in substantially the same condition as it had been when Noyes saw it attached to the press on the day after the accident. He was told at that time that the press had not been touched after the accident and prior to his arrival. The knob was pointing to the right-hand position.

He found that the selector switch would not hold in the middle, or *inch* position, and said that the wiring diagram did not provide for any terminals at the *inch* position. He stated, however, that it would be possible to start and stop the machine in such a way as to accomplish a movement equivalent to an *inching* operation.

Defendant contends in this court that plaintiff failed completely to prove his alleged cause of action, so that defendant was entitled to a directed verdict or a judgment in its favor notwithstanding the verdict. As its second major contention, defendant argues that the verdict and judgment were contrary to the manifest weight of the evidence. The rules governing this court's consideration of the case under these two circumstances are too well-settled to justify citation of authority.

We conclude from our study of the record that there was sufficient evidence supporting plaintiff's cause of action to require submission of the case to the jury. In other words, there was evidence which, in our opinion, tended to establish that the press had been delivered by defendant with a selector switch which was negligently miswired in such a way as to eliminate

74

safety features otherwise present and which proximately caused plaintiff's injury.

■ We also conclude that the manifest weight of the evidence is not to be found on the side of defendant. It is true that plaintiff's witness Cesky did testify that he examined the press upon delivery and that it tested properly in both the *once* and the *inch* positions. Defendant urges us to accept this testimony as manifestly outweighing all other evidence to establish defendant's speculation that someone must have taken the switch apart after delivery and reassembled it differently. This we cannot do. Cesky's own testimony contains contradictions to this proposition, as does Rudle's and, essentially, all the rest of plaintiff's evidence on the issue of liability. Absent any more precise testimony as to the condition of the wiring on the switch at delivery, we are unable to decide that the jury's verdict on this issue was clearly wrong.

■ ■ Because of our view as to the weight of the evidence we do not consider pertinent the cases which defendant relies on in this regard. We agree with defendant that the mere happening of an accident does not raise a presumption of negligent manufacture, and that plaintiff must carry the burden of proving his case. Rotche v. Buick Motor Co., 358 Ill 507, 511, 512, 193 NE 529, unlike the instant case, was one in which there was voluminous evidence of inspections in the course of manufacture, and at the time of delivery. Watts v. Bacon & Van Buskirk Glass Co., 18 Ill2d 226, 231, 163 NE2d 425, involved a glass door—not an inherently dangerous article—and plaintiff's claim was that defendant should have installed tempered glass in the door instead of plate glass, even though plate glass was customarily used. In Moss v. Wagner, 27 Ill2d 551, 555, 190 NE2d 305, the court found that the evidence presented a factual question for the jury, and that the entering of a judg-

ment notwithstanding the verdict in plaintiff's favor had been improper.

■ ■ We also agree with defendant that the causal relation of a manufacturer's negligence to an injury may be broken by the intervention of a superseding cause. In the case cited by defendant for this point (Carter v. Yardley & Co., 319 Mass 92, 64 NE2d 693, 697) the reviewing court found that there was no evidence of such a superseding cause. We think that the same situation obtains here, but if it could be said that there is any evidence of such a superseding cause, it would at most have raised a question of fact for determination by the jury.

■ We would agree also that ordinarily the use of an article with safety for a lengthy period of time renders unreasonable an inference that the article contained a manufacturing defect. But we also believe that consideration must be given to the character of the alleged defect to determine whether it be of such a nature as to cause a delayed reaction. Defendant relies on Miszczak v. Maytag Chicago Co., 11 Ill App2d 496, 501, 138 NE2d 52, on this point. There the court held, however, that neither in the facts of record nor in the plaintiff's brief had there been a suggestion of "any possible cause" of the alleged function failure of a washing machine's wringer tension release mechanism. In the case before us there is not only an explanation of the delayed misfunction of the selector switch, but there is also adequate evidence to support plaintiff's theory of the case. The same distinction is applicable to the case of Brooks v. Hill-Shaw Co., 117 F2d 682, 685.

■ Defendant attaches significant weight to the fact that the switch control knob found on the press at the time of the accident was not the same knob which had been on the switch at the time the press was delivered. While the control knob itself does not, of course, affect the actual operation of the switch, this argu-

76

ment is made in furtherance of defendant's contention that we must infer that the entire assembly of the switch, including its contact block, had been "tampered with" after delivery. We do not believe that such an inference is required, especially in view of the testimony of defendant's witness Noyes who said that the control knobs of the two manufacturers were interchangeable and that he could see no difference between them.

As a ground for reversal, defendant assigns the admission into evidence of the wiring diagram which we have referred to above. As stated in defendant's brief, the original wiring blueprint came from defendant and was delivered with the press. Vincent Pawlak, a witness for plaintiff, who was a draftsman employed by Central, testified that he made some changes on the blueprint in October 1961 after the accident. The exhibit in evidence is a photocopy made by Pawlak from the original blueprint including the several changes which he had made. The original blueprint was thereafter destroyed.

██ Defendant's objection to this diagram is that the witness did not make sufficiently clear precisely what changes he had made on the diagram so as to identify what he meant in referring to the changes he had "indicated." This objection was overruled, and we think properly so. The diagram adequately shows on its face what the indicated changes were. Plaintiff does not seek to place any reliance upon the changes in the diagram, and its use in evidence was basically for the purpose of permitting questions to be asked of the expert witnesses concerning the diagram in its original form. When the experts—both plaintiff's and defendant's—were testifying about the wiring of the switch in comparison with the wiring arrangement in the diagram, they were instructed by both court and counsel to ignore the changes on the diagram. Neither witness expressed any difficulty in reading the diagram on that basis. Defend-

ant's expert witness Jennings was specifically told by defense counsel to "ignore those changes," and he proceeded to testify accordingly. Plaintiff's witness Blair was treated similarly. A review of their entire testimony indicates clearly to us that both professors were outstandingly intelligent and articulate, and would have had no hesitation in stating any problem they might have had in identifying the changes they had been told to ignore, if any such problem had existed.

Under all these circumstances, we think that the cases relied on by defendant for this point are not applicable. Gage v. City of Chicago, 225 Ill 218, 80 NE 127; Hutchison v. Kelly, 276 Ill 438, 114 NE 1012; Waggoner v. Clark, 293 Ill 256, 127 NE 436. In each of these cases the proponent sought to rely upon the document in its altered form, and in that situation was required to make adequate explanation of the alterations. As we have mentioned, this is not the situation in the case before us.

At the conference on jury instructions defendant made timely objection to one of the instructions tendered by plaintiff and given by the court. That instruction reads:

> It was the duty of the defendant before and at the time of the occurrence, to use ordinary care for the safety of the plaintiff.

Defendant now assigns the giving of this instruction as reversible error on the ground that the only negligence charged to defendant was in connection with the manufacture of the press some five years prior to the accident and that defendant owed no duty to plaintiff at the time of the occurrence.

When the point was raised at trial, counsel for plaintiff argued that the time of the accident should be covered, otherwise the jury might be misled into thinking that defendant owed no duty to plaintiff when the press was manufactured, since plaintiff "wasn't in the picture

at the time." The court apparently agreed, and took the position that the instruction was proper because "it is a continuing proposition."

■ ■ We are aware of the principle that it is error to instruct the jury on an issue not raised by the pleadings. Heideman v. Kelsey, 7 Ill2d 601, 606, 131 NE2d 531, cited by defendant. We also agree with defendant that the mere fact that the instruction is found in IPI (No. 10.04) can be of no real assistance to plaintiff here, because, as we have frequently held, any particular IPI instruction, however good in form, must first be shown to be applicable before it should be given in any specific case.

■ We believe, however, that the giving of the instruction in this case did not constitute reversible error. The issue had been raised by the complaint in which it was charged that defendant negligently manufactured the press (as to its wiring, etc.) and delivered it in a defective and dangerous condition; that the press continued to be defective and dangerous to the time of the accident; and that plaintiff's injury was a proximate result of defendant's negligence in design, manufacture, etc.

The issue was also clarified in the closing arguments of counsel and, we believe, by the instructions of the court when considered all together. A fairly long and detailed "issues" instruction was given to the jury in which plaintiff's claim as to defendant's negligence was set forth with considerable specificity. In this instruction it was made perfectly clear to the jury that plaintiff was charging defendant with the improper and negligent design and manufacture of the selector switch in question. Defendant's denial of the charges was also set forth accurately and specifically.

■ We do believe that the instruction complained of could have been phrased better. Looking at the instructions as a whole, however, we do not see revers-

79

ible error. Reivitz v. Chicago Rapid Transit Co., 327 Ill 207, 213, 158 NE 380.

Defendant also urges upon us that a fair trial was denied to defendant because of improper and prejudicial statements made by both court and counsel during the trial and by plaintiff's attorney in his closing argument to the jury; citing Belfield v. Coop, 8 Ill2d 293, 134 NE 2d 249; Crutchfield v. Meyer, 414 Ill 210, 111 NE2d 142; and other cases, including this court's opinion in Bulleri v. Chicago Transit Authority, 41 Ill App2d 95, 190 NE2d 476.

In the course of the cross-examination of plaintiff's witness Cesky the following transpired:

> Q. If the switch was not wired in the "inch" position, the ram wouldn't function in that fashion?
> A. Yes, it would. Yes, I did test this ram in "inch" position and in "once." Yes, and in "inch" position, it functioned by inching down.
> Q. So that when you tested this switch on the occasion of your installation and examination of the press you turned it to "inch" position and the ram inched down?
> A. If you hold your hand on it, it comes down completely.
> Q. I didn't —— ——.
> Mr. Siegal (Plaintiff's attorney): I'll ask that the answer stand. It is important, if the court please. Counsel is trying to cover that up.

 At that point defendant's attorney moved for a mistrial, and argues here that the remark unjustifiably called into question his good faith and ethical conduct to such an extent that it prejudiced his client's case. While we consider counsel's comment to have been ill-advised, and we do not condone it, we nevertheless do not attribute to it the importance or the consequences which defendant urges upon us. We do not consider it

ground for reversal. Nelson v. Union Wire Rope Corp., 39 Ill App2d 73, 98, 99, 187 NE2d 425; Moore & Co. v. Champaign Nat. Bank, 13 Ill App2d 232, 246, 247, 141 NE2d 97.

■ ■ In his closing argument to the jury plaintiff's attorney commented upon the failure of defendant to have produced as witnesses the employees of Central who had, in fact, testified on behalf of plaintiff. This remark was improper, and it was absurd to argue, in effect, that an adverse inference should arise against defendant under the circumstances of this case. Brichacek v. Hampton, 54 Ill App2d 284, 297, 203 NE2d 737; McGinnis v. McGinnis, 211 Ill App 240, 245. We do not, however, consider this episode to have been sufficiently prejudicial to defendant to warrant reversal of the judgment.

■ ■ We take the same position in regard to an admonishment by the court during trial that defense counsel should not "make a speech" in the course of stating his objection to a question put by plaintiff's attorney. If this was an unfair comment by the court, and we are inclined to think it was, it constituted, in our opinion, a harmless error. Anderson v. Inter-State Business Men's Acc. Ass'n of Des Moines, Iowa, 354 Ill 538, 550, 188 NE 844.

Finally, defendant complains about the questioning of a witness by plaintiff's attorney which elicited testimony that a few days after the accident defendant had replaced the selector switch on a second one of its presses (of the same type as the one in question) at Central's plant. The cases relied on by defendant express the view that post-accident alterations or corrections in conditions pertinent to the alleged injury should not be discouraged by making them appear as admissions, and that this principle has a basis in sound public policy. Howe v. Medaris, 183 Ill 288, 55 NE 724; Grubb v. Illinois Terminal Co., 366 Ill 330, 8 NE2d 934; Day v. Barber-Colman Co., 10 Ill App2d 494, 135 NE2d 231.

Plaintiff's reply to this point is that the court had stated, at the first of several timely objections, that the matter was immaterial. Plaintiff's attorney was thereafter permitted to continue the questioning, however, and, over repeated objections was allowed to show that a different kind of switch had been substituted on both presses. (No objection was made concerning the change of switches on the press in question because the first switch was removed for examination by the experts and for introduction into evidence.) Plaintiff also says that defendant's objections were invalid because defense counsel had previously opened the door, in effect, by asking whether the original switches on the two presses had been the same and whether they had not both worked satisfactorily for some years, the answers being affirmative in both instances.

 We are not impressed with plaintiff's response on this point. We believe the court's rulings in this regard were erroneous, but not of sufficient gravity to deprive defendant of a fair trial and thus to warrant reversal of the judgment.

As to these last several contentions in which we recognize nonreversible error, we refer again to what we said in Nelson v. Union Wire Rope Corp., 39 Ill App 2d 73, 98, 187 NE2d 425, to the effect that there is not likely to have been a hotly contested jury trial, such as this one "in which there were not some errors committed by the trial judge and some conduct on the part of ardent advocates which was not entirely proper. In so stating, we do not believe that we encourage the lowering of professional standards, but merely place in their proper perspective the mistakes which both court and counsel will ever seek to avoid, but probably never with complete success."

The judgment of the Circuit Court is affirmed.

Affirmed.

DRUCKER, P. J. and McCORMICK, J., concur.