Louise Matthews, Plaintiff-Appellee, *v.* Stewart Warner Corporation, Defendant-Appellant.

(No. 57771;

First District (2nd Division)—June 10, 1974.

Kirkland & Ellis, of Chicago (Caryl P. Bonotto and Gary M. Elden, of counsel), for appellant.

Joseph A. Rosin, of Chicago, for appellee.

Mr. JUSTICE DOWNING delivered the opinion of the court:

Plaintiff was allegedly injured when a "zerk" (a steel lubrication fitting) allegedly chipped while plaintiff was inserting the zerk into a universal joint by means of an air press. Plaintiff brought suit against defendant corporation, the alleged manufacturer of the zerk, grounding her action on a products liability theory. After a trial before a jury, a verdict of $85,000 was entered on plaintiff's behalf. Defendant's appeal followed.

Before going further, some description of a zerk is necessary. A zerk is a fitting, made out of one piece of metal, the lower half looking somewhat like a screw, the upper half like a little ball; the upper half is separated from the lower half by a circular "collar" or "shoulder." There is a small hole or channel extending through the zerk from top to bottom, whose purpose is to provide an opening through which grease or oil can be forced—by means of a grease gun—into whatever piece of equipment the zerk has been inserted in a given instance; in the matter at

472

hand, for example, a universal joint. Inside the zerk, a spring holds a stopper against the hole, and a grease gun is able to push the stopper aside to insert a lubricant into the zerk. When the stopper moves back into place, the lubricant is prevented from escaping. The lubricant flows down the zerk's channel and into the piece of equipment to which it is attached.[1]

The testimony adduced in the trial court can be summarized, in its pertinent portions, as follows. Plaintiff testified that at the time of trial she was 27 years old and, at the time of the accident, age 20; that, in June of 1964, she had begun employment in assembly line work at Wesco Automotive Parts Company in Chicago; that, during the morning hours of August 4, 1964, she was working at a machine (an air press), inserting zerks into universal joints[2]; and that her manner of inserting zerks into universal joints was this: the universal joints were in a pan on a runner beside the machine on the right hand side, and she would pick up the universal joint with her right hand and place it in a vice-like cradle in the machine; she would then pick up a zerk with her right hand, place it straight up into a hole in the universal joint, twist the vice to close it, and press a handle on the machine, which would drive a steel press hammer onto the top of the zerk, driving the zerk into the hole in the universal joint.

Plaintiff further testified that, with respect to the circumstances surrounding the accident and injury on August 4, 1964, she placed a zerk into a universal joint—in a straight up and down position—and tightened the vice. She identified a zerk she was shown, manufactured by defendant, as similar to the zerks she had worked with at Wesco. She then hit the air press handle in order to activate the press, and the steel press hammer came down to the top of the zerk, commencing to push it into the universal joint. She then heard an unusual sound—something like a "pshh" sound—and felt a stinging sensation underneath her left eye. She looked down and saw that the top of the zerk had been broken. The universal joint was still in place, and the zerk was inserted in the joint up to its "collar" point, but the top portion of the zerk—though not the entire top—was broken off. She wiped her eye, and, after so doing, noticed that her vision was becoming somewhat blurred. She summoned her

---

[1] The prototype of the zerk involved in plaintiff's accident, according to defendant's specification charts, measures 35/64 inches from top to bottom, has a "collar" or "shoulder" diameter of 11/32 inches, and measures ¼ inch from a point below the collar to the bottom of the zerk.

[2] For the purposes of this discussion, a universal joint is made out of steel and can be characterized as looking like an "X," whose distance is approximately 3½ inches from tip to tip. A hole is drilled at the apex between two arms of the "X" in order to accommodate the zerk.

foreman, who sent her to a clinic to be examined. The universal joint with the broken zerk was still in the vice when she left the factory; she never again returned to Wesco.

Subsequently, plaintiff's left eye was enucleated, and medical testimony adduced at trial was to the effect that the condition of plaintiff's eye was the result of, and definitely related to, a piece of the zerk flying into her eye.

Philip Lapine, a purchasing agent for plaintiff's employer at the time of the accident and at the time of trial, testified, in part, that from 1961 through 1964 his company purchased all its zerks from defendant, Stewart Warner; that his company used what was called a "mighty mite" press to drive zerks into the particular size universal joints involved herein; that the press sits on a bench, is 12 to 18 inches wide and 2½ to 3 feet in height, and has a "stroke" anywhere from 6 to 8 inches long; that the mighty mite press was an air driven press to which a ram was connected and that 120 pounds of air pressure was required to drive the drill press; and that, in 1964, air was supplied to the drill press from an air compressor[3].

Mr. Lapine went on to testify that his company maintained a separate area in the assembly department where Stewart Warner zerks, which were delivered in corrugated boxes, were kept and that the area was about 30 to 40 feet from the assembly lines where the zerks would be used.

Joseph Kielbasa, the supervisor of the assembly department in which plaintiff worked at the time of the accident, testified, *inter alia,* that in 1964 the department maintained approximately six presses of the type used to insert the size zerks in question; that he was notified about plaintiff's accident and went to the area in which she was working; that after he had discussed the accident with plaintiff, he looked at the product she was working on and saw that a piece was still intact on the fixture, but that the top of the zerk was split at an angle, not lengthwise or sideward; that less than half of the zerk top was missing; that he then gave the machine plaintiff had been working on a slight inspection, failed to find anything wrong with the machine, and, within five to ten minutes, placed another employee at work on the machine; that the other employee worked on the machine for the balance of the day; that the machine was operable and that nothing was done to the machine

---

[3] It is to be noted that the questions put to Mr. Lapine with regard to the mighty mite press were not specific, in any manner, as to the time at which the presses he was describing were in operation at Wesco; that is, he did not indicate, nor was he asked, whether the machines he was describing were those in operation at Wesco at the time of plaintiff's accident or those in operation at Wesco at the time of the trial.

following the accident; that the universal joint in the machine plaintiff was operating was removed from the press and placed in the plant superintendent's office; and that, when it was so placed, it contained the zerk fitting which had broken.[4]

Kielbasa was later recalled as a witness for plaintiff and testified, in pertinent part, that the maximum pressure output of the compressor which supplied the mighty mite presses was 100 pounds; that the maximum pressure output he, himself, had even seen on the pressure gauge was 90 pounds; that whenever the pressure fell below 75 or 80 pounds, the air control machines were shut off until the pressure built up to 90 pounds; that the problem was never over-pressure, but under-pressure; and that there was trouble with the air compressor two or three times daily.

Marvin Salzenstein, a degreed mechanical engineer specializing in machine design, air pollution, and computation, was called to testify as plaintiff's witness. He testified that he had examined the mighty mite presses at plaintiff's former employer on two occasions in May of 1971; that is, some five months prior to trial in this cause and nearly seven years after plaintiff's accident. When asked to describe the mighty mite press, he responded that it was a small table-mounted press operated by compressurized air, which would enter at the top and drive a piston downward. The piston was attached to a ram at the bottom, which would drive whatever one was pressing into the base. There were two handle controls on the press, so that an operator would have to use both hands on the controls to press the "two buttons" which would bring the ram downward to do the pressing. When the controls were released, the press would come back up again.

The witness was then asked whether he was familiar with the mighty mite press as it existed in 1964, to which he responded that he was not. Salzenstein, continuing, testified that assuming 100 pounds of air pressure per square inch was entering the machine, he could determine the maximum amount of force the ram could exert[5]. Salzenstein stated that

---

[4] It is to be noted that the universal joint and the zerk in question were not presented in evidence at trial. Apparently they were not available.

[5] It is to be noted that, at this juncture, defense counsel objected to the use of the 100-pounds-per-square-inch-of-pressure figure on the grounds that there had been no testimony that, on the day of the occurrence, 100 pounds per square inch of pressure had been entering the mighty mite press. In response to the court's question, counsel for plaintiff stated that he intended to later tie up the testimony by recalling Joseph Kielbasa as plaintiff's witness, who would testify to the amount of pressure entering the mighty mite press in 1964. We find, from a reading of the record, that the matter was later tied up, based upon Joseph Kielbasa's testimony on this point, as set forth above in this opinion.

the matters he would consider in making his determination would be the air pressure entering the mighty mite press, the sizes of the machine's piston and ram, and the narrowest cross-section of the zerk, but that he would not have to know the length over which the ram would descend in order to determine the force it would exert. The witness was then called upon to examine a zerk, manufactured by defendant, similar to that used by plaintiff on the day of the accident. He testified that a zerk of that nature should, if properly manufactured, have a tensile strength of 80,000 to 100,000 pounds per square inch; that if one were to stretch the material to a point approaching its tensile strength, the material would finally fail as it reached its tensile strength; and that he had been able to determine the maximum amount of force that the ram of a mighty mite press could exert on the type of zerk he had been shown in the ram's attempt to push the zerk into a universal joint.

Salzenstein then explained the manner in which he would calculate the amount of stress the zerk could bear, utilizing the various factors he considered necessary to make his determination, as set out above. A lengthy hypothetical question, propounded by plaintiff's counsel, was then put to the witness. After defense counsel objected to the hypothetical question, the following colloquy took place:

"THE COURT: State any additions or deletions from that hypothetical question. That you—

MR. BONOTTO [defense counsel]: I do not think basically, that the man is qualified to express an opinion on this product. I do not think that his testimony today went out [sic] to that plant some time in May of this year and the facts that counsel has given him are sufficient for him to express an opinion or what might have occurred in August of 1964.

THE COURT: Any addition or deletion from the hypothetical question?

MR. BONOTTO: None for the moment.

THE COURT: Objection overruled. He may answer.

THE WITNESS [Marvin Salzenstein]: Yes, I do have an opinion.

BY MR. ROSEN [sic] (counsel for plaintiff): What is that opinion?

* * *

Q. In other words, if this zerk were made pursuant to proper specifics regardless of what happened, it couldn't break unless you put at least the amount of force that met their minimum standards, correct?

A. That's correct.

* * *

Q. [I]n order for this ram to do anything abnormal to that zerk as far as shattering the zerk, you would have to have 100,000 pounds of pressure, is that correct?

A. Well, anywhere between 80 [*sic*] and 100,000 is the minimum for the material."

On cross-examination, Salzenstein was asked several questions regarding the method and means used to acquire his knowledge of the operation of the mighty mite press, including questions concerning the piston and ram dimensions, the air pressure input for the mighty mite press, and so forth. He was also asked whether he was familiar with any standards used for the manufacture of zerks, to which he responded that he was not.

On redirect examination, Salzenstein was asked for his opinion as to what the tensile strength of a zerk should be in order to properly accommodate the type of intended use to which the zerk was to be put. He responded that it was a question to which he could not give an answer.

Leonard Taussig, a metallurgical engineer appearing on plaintiff's behalf, testified, in part, that he had examined zerks and the universal joint into which they would be fitted; that he had examined information relative to certain specifications published by defendant regarding the zerks he had examined; that, based upon his examination of the prototype of the zerk plaintiff used and upon his examination of defendant's specifications for the zerk's manufacture, it was his opinion that the zerk involved in plaintiff's accident was defective; that the reason for his opinion was that the hypothetical question propounded for him stated that 54,000 or 57,000 pounds per square inch of stress was imposed upon the zerk, defendant's specifications indicated that the tensile strength of the zerk was to have been 80,000 to 100,000 pounds per square inch, and the figures given in the hypothetical were all below the specifications, which would indicate defectiveness; and that there were certain areas where the defective condition may have entered (in the heat treatment or plating processes, or in the use of defective original materials), but, as he described them, they were conjectural at best.

Allen Gothelf, chief metallurgist for the defendant corporation, appearing on behalf of defendant, testified, in part, that in discussing the pounds per square inch of pressure applied by a press in the process of inserting the prototype zerks into universal joints, two factors were to be considered: the length of the stroke of the press and the force applied to the zerk; that he had never seen a mighty press, but that he understood it to be an air-operated press; that, assuming a zerk shattered under pressure less than the tensile strength of the raw steel used

in its manufacture, he would not know whether the zerk would be defective; that if force had been applied straight down upon the zerk, the zerk might have worked as intended; and that if the force had been applied at an angle, a break could occur in a perfectly good fitting.

Defendant, on this appeal, presents several issues which it asks us to consider; they are:

(1) whether the trial court erroneously admitted the testimony of plaintiff's expert witnesses, Salzenstein and Taussig;

(2) whether the trial court erroneously excluded defendant's evidence concerning (a) industry standards and the state of the art of zerk manufacturing; (b) certain zerks, some manufactured by defendant, others not, which had been found at plaintiff's employer's plant; and (c) defendant's manufacturing, inspecting, and testing procedures;

(3) whether certain remarks made by counsel for plaintiff were improper and prejudiced defendant's right to a fair trial; and

(4) whether defendant was entitled to a judgment notwithstanding the verdict.

## I.

With respect to the first issue, defendant argues that Marvin Salzenstein's testimony in the trial court was incompetent and without proper foundation in these regards: (1) because Salzenstein admitted that he did not know what standard should be used in determining whether a zerk is defective; (2) because there was no evidence respecting the piston and ram sizes of the 1964 mighty mite press; (3) because there was no evidence concerning the maximum pressure which could have been exerted by the 1964 mighty press; and (4) because Salzenstein did not know whether the press struck the zerk at an angle and/or near an edge, Salzenstein could not have known the narrowest cross-section of the portion of the zerk which bore the impact of the press. Moreover, defendant claims that Salzenstein's testimony was confusing and misleading and that it invaded the province of the jury by finding an ultimate fact. Regarding Leonard Taussig's testimony, defendant asserts that it had all of the deficiencies of Salzenstein's testimony.

Plaintiff, on the other hand, urges generally with respect to these points that defendant failed to make proper objections to the testimony of Salzenstein and Taussig and failed to preserve the points on appeal by failing to incorporate them in defendant's post-trial motion; thus, plaintiff claims, the arguments have been waived by the defendant.

■■ Plaintiff's theory in the court below was to follow the requirements of a strict liability case, set out in classic form in *Suvada v. White Motor*

*Co.* (1965), 32 Ill.2d 612, 210 N.E.2d 182. Briefly, with respect to the *Suvada* requirements as they relate to plaintiff's claim here, plaintiff was to prove: (a) that the zerk manufactured and sold by the defendant was unreasonably dangerous or not reasonably safe for intended use; (b) that the said unsafe condition existed at the time the zerk left the defendant's control; and (c) that the said unsafe condition was a direct and proximate cause of plaintiff's injury. Plaintiff urges that ample evidence was offered below to prove each of these propositions.

We have thoroughly reviewed the record in this matter with a keen eye, and we have scrutinized the testimony of plaintiff's experts, Salzenstein and Taussig, in light of defendant's arguments relating to it. Based on the record before us, we have reached the following conclusions. Save for the objection (and its resolution) respecting the 100-pounds-per-square-inch-of-pressure figure, which we have discussed in footnote 5 above, the record reflects an absence of proper, specific objections on the part of defense counsel to the statements made by plaintiff's experts in their testimony, which defendant now, for the first time, characterizes as objectionable and erroneously admitted into evidence.

Defendant argues now that because there was no evidence admitted concerning the 1964 press piston and ram size, Salzenstein's opinion was without foundation. However, defendant, at no time—either by way of a specific objection or on Salzenstein's cross-examination—challenged either the measurement of the piston or ram, or lodged an objection that the ram or piston sizes in 1964 were or may have been different than those determined by Salzenstein.

Defendant argues now that because there was no proof concerning the maximum pressure which could have been exerted by the 1964 press, Salzenstein's opinion was without foundation. However, we find again, in reviewing Joseph Kielbasa's testimony on this matter, that defendant failed to raise proper, specific objections at any time throughout the course of that testimony; that is, objections as they would relate to the questions which defendant now seeks to raise for the first time before this court. Likewise, defendant did not offer any evidence that the 1964 press differed from the 1971 press examined by Salzenstein.

Defendant now asserts that Salzenstein could not have known the narrowest cross-section of the portion of the zerk which bore the impact, because, defendant claims, Salzenstein did not know whether the press struck the zerk "at an angle and/or near an edge"; therefore, defendant concludes, the testimony was without foundation. Again, we find no objection from defendant concerning the figure employed by Salzenstein

in his calculations as representing the zerk's narrowest cross-sectional area.

■■ Regarding the other assignments of error defendant attempts to raise concerning the lack of foundation for Salzenstein's testimony, we have considered each of them, and suffice it to say that in each instance we find a failure on defense counsel's part to make a proper objection. It is fundamental that to preserve any evidentiary issue for consideration on review, a timely objection must be made in the trial court specifying the grounds upon which the objection is based. See *People v. Burage* (1961), 23 Ill.2d 280, 283, 178 N.E.2d 389; *Schoolfield v. Witkowski* (1st Dist. 1964), 54 Ill.App.2d 111, 127-128, 203 N.E.2d 460; and *Stegmann v. Zachariah* (5th Dist. 1964), 46 Ill.App.2d 7, 12-13, 196 N.E.2d 703.

Defendant further contends that Salzenstein's testimony invaded the province of the jury by finding an ultimate fact, *i.e.*, "defectiveness." This court very recently spoke to this issue in *In re Roberts Park Fire Protection District*, 20 Ill.App.3d 282, 288, 314 N.E.2d 208, 213, where we stated:

> "It was proper for counsel for both parties to elicit the opinion of expert witnesses regarding the ultimate question before the court. (*Miller v. Pillsbury Co.*, 33 Ill.2d 514, 516, 211 N.E.2d 733, cited in *Moren v. Samuel M. Langston Co.*, 96 Ill.App.2d 133, 142, 237 N.E.2d 759.) Despite early precedents to the contrary, the reviewing courts of Illinois have approved the practice of permitting the expert to express directly his opinion upon ultimate issues on the theory that 'since the trier of fact is not required to accept the opinion of the expert, such evidence does not usurp the province of the jury." (*Merchants National Bank v. E. J. & E. Ry. Co.*, 49 Ill.2d 118, 122, 273 N.E.2d 809.) See also *Coleman v. Illinois Central R. R. Co.*, 13 Ill.App.3d 442, 444, 300 N.E.2d 297, involving an expert opinion on adequacy of protection at a railroad crossing as does *Merchants National Bank;* also *Kobrand Corp. v. Foremost Sales Promotions, Inc.*, 8 Ill.App.3d 418, 421, 291 N.E.2d 61, concerning the opinion of an expert regarding competition in the sale of intoxicating liquor."

We find that this language aptly applies to the instant set of circumstances.

In addition, defendant argues that Salzenstein's testimony was confusing and misleading; we simply find no merit in the argument.

Turning now to Leonard Taussig's testimony, defendant proffers two contentions: first, that it had all the deficiencies of Salzenstein's testimony and, therefore, should not have been admitted; and, second, that the testimony should have been excluded owing to plaintiff's alleged

noncompliance with certain pre-trial orders, which allegedly frustrated defendant's discovery.

Regarding the first contention, we find, as we found with respect to Salzenstein's testimony, that there was, again, a failure to lodge proper, timely objections to the testimony. At one point, after a hypothetical question had been put to Taussig concerning whether the zerk of the hypothetical had been properly manufactured, defense counsel did object in this manner: "I have an objection, if it please the court. Not as to his qualifications, but as to the facts that he took into consideration. They are not sufficient facts to base an opinion." The court then asked whether counsel for defendant wished to add any facts to the hypothetical, to which counsel responded that he did not, at the moment. We do not believe that this objection preserved for this appeal any of the evidentiary issues defendant now attempts to raise before this court. (See *Schoolfield v. Witkowski* and *Stegmann v. Zachariah, supra.*) Moreover, we find that the above-quoted language from *In re Roberts Park Fire Protection District, supra,* adequately answers defendant's argument that Taussig's opinion on "defectiveness" invaded the jury's province; we hold that it did not.

■■ Defendant further contends that Taussig's testimony should have been excluded because of plaintiff's alleged noncompliance with the court's order allowing defendant to depose plaintiff's prospective expert witnesses; this alleged noncompliance, defendant argues, frustrated its discovery. Briefly, a few days prior to trial, and prior to the selection of the jury, the trial judge ordered that defendant could depose plaintiff's prospective expert witnesses, and there was an agreement between counsel that the said witnesses would be brought to defense counsel's office for the purposes of deposing them. On the day arranged for depositions, Marvin Salzenstein was deposed. While the trial was in progress, immediately before the plaintiff was to call Leonard Taussig, counsel for defendant objected to his being allowed to testify, stating that he knew nothing about Mr. Taussig and that he (Taussig) had never been named in any of the discovery procedures.[6] After hearing argument on defendant's motion to exclude Taussig, the court ruled that defendant's motion would be denied insofar as permitting Taussig to testify. We find that it was within the sound discretion of the court to so rule and that the discretion was not abused.

■■ In its brief, defendant argues that it was denied the opportunity

---

[6] The record shows that plaintiff's counsel had earlier sent defense counsel a letter, indicating that plaintiff might call as an expert witness "the Taussig Associates, Inc." The record also shows that Leonard Taussig's name arose repeatedly during the Salzenstein deposition.

to take Taussig's deposition. From the totality of the circumstances reflected by the record before us, we do not see that to have been the situation. While it may be true that plaintiff was in technical violation of the trial court's order with respect to the depositions, we believe that —even though the trial was in process—the court would have allowed Taussig's deposition had the request been forthcoming from defendant. In any event, we believe that technical noncompliance with an order such as that in question would not warrant our overturning the verdict of the jury and the judgment of the court below.

We have reviewed the paragraphs of defendant's supplemental post-trial motion which relate to the points we have just discussed, and we find that those points are not particularized with the specificity required by Supreme Court Rule 366(b)(2)(iii) (Ill. Rev. Stat. 1971, ch. 110A, par. 366(b)(2)(iii)). Consequently, defendant may not now urge as error the ruling on the motion made in the court below. *Danielson v. Elgin Salvage & Supply Co.* (2nd Dist. 1972), 4 Ill.App.3d 445, 447, 280 N.E.2d 778.

## II.

The second issue presented for review is whether the trial court erred in excluding defendant's evidence concerning industry standards and the state of the art of zerk manufacturing; whether it erred in excluding certain zerks from evidence; and whether it was error to exclude evidence of the defendant's manufacturing, inspecting, and testing procedures.

■■ As stated earlier, plaintiff's theory in the trial court followed the classic requirements of a strict liability case as delineated in *Suvada v. White Motor Co.*, 32 Ill.2d 612, 210 N.E.2d 182. In resolving the issue with which we are now dealing, we need look no further than the rationales of *Suvada* and the decisions interpreting it. The court in *Suvada*, at pages 620-621, made these statements in analyzing the strict liability concept:

> "In analyzing the basis for the imposition of strict liability Justice Traynor, speaking for the California court stated, 'Although in these cases strict liability has usually been based on the theory of an express or implied warranty running from the manufacturer to the plaintiff, the abandonment of the requirement of a contract between them, the recognition that the liability is not assumed by agreement but imposed by law [citations] and the refusal to permit the manufacturer to define the scope of its own responsibility for defective products [citations] make clear that the liability is not one governed by the law of contract

warranties but by the law of strict liability in tort. Accordingly, rules defining and governing warranties that were developed to meet the needs of commercial transactions cannot properly be invoked to govern the manufacturer's liability to those injured by its defective products unless those rules also serve the purposes for which such liability is imposed.' (59 Cal. 2d 57, 63.) We agree.

We note that the views herein expressed coincide with the position taken in section 402A of the American Law Institute's revised Restatement of the Law of Torts approved in May 1964. The section provides:

'(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to. the ultimate user or consumer, or to his property, if

'(a) the seller is engaged in the business of selling such a product, and

'(b) it is expected to reach the user or consumer in the condition in which it is sold.

'(2) The rule stated in subsection (1) applies although

'(a) the seller has exercised all possible care in the preparation and sale of his product, and

'(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller'."

■■ In *Cunningham v. MacNeal Memorial Hospital* (1970), 47 Ill.2d 443, 453, 266 N.E.2d 897, our supreme court made clear that a defense predicated upon a manufacturer's conduct was not available to a defendant in a strict liability case as a matter of law.

The soundness of the *Cunningham* opinion has been most recently underscored in *Gelsumino v. E. W. Bliss Co.* (1st Dist. 1973), 10 Ill. App.3d 604, 295 N.E.2d 110, which held a state-of-the-art defense irrelevant with respect to strict liability counts.

■■ We are satisfied, based upon the established law of this state. on the matter, that the court below properly excluded the evidence in question.

### III.

Defendant next contends that certain remarks made by counsel for plaintiff were improper and prejudiced defendant's right to a fair trial. Without belaboring the matter, we find, based upon a review of the entire record, and specifically upon a review of those remarks claimed to be prejudicial, that the remarks were not such as to warrant a remandment to the trial court for a new trial in this cause.

## IV.

Finally, defendant urges that this court remand the instant case and direct the trial court to enter a judgment for the defendant. We have reviewed the evidence in its totality, and we do not believe that a judgment notwithstanding the verdict should be entered in this case, as it is not a case in which all of the evidence, when viewed in its aspect most favorable to the plaintiff, would so overwhelmingly favor the defendant herein that no contrary verdict based upon that evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill.2d 494, 510, 229 N.E.2d 504.

We find no basis on which any prejudicial error occurred necessitating a new trial. For these reasons, then, we affirm the judgment of the circuit court of Cook County.

Judgment affirmed.

STAMOS and LEIGHTON, JJ., concur.