ABDON RIOS, Plaintiff-Appellee, *v.* NIAGARA MACHINE & TOOL WORKS, Defendant-Appellant.

(No. 56435;

First District (1st Division)—June 4, 1973.

*Rehearing denied July 5, 1973.*

740

Clausen, Hirsh, Miller & Gorman, of Chicago, (John R. Caffrey and James T. Ferrini, of counsel,) for appellant.

Joseph A. Rosin, of Chicago, for appellee.

Mr. JUSTICE GOLDBERG delivered the opinion of the court:

Abdon Rios (plaintiff) brought suit for personal injuries against Niagara Machine & Tool Works (defendant) on a strict tort liability theory. Plaintiff was injured while operating a punch press manufactured by defendant and sold to Hammond Organ Company where plaintiff was employed. A jury returned a verdict in plaintiff's favor and defendant appeals. No point is raised on the amount of the verdict.

Defendant urges that plaintiff has failed to prove the necessary elements for imposition of strict tort liability as regards the defective condition of the machine when sold and also that the sole proximate cause of plaintiff's injury was an allegedly defective safety device which had been affixed to the machine by plaintiff's employer. Defendant also urges that the press had been materially changed subsequent to its sale. In response, plaintiff contends that it was defendant's duty to manufacture and sell a press that was reasonably safe and not unreasonably dangerous; this duty had been breached by defendant and the unreasonably dangerous condition existed when the press left defendant's control; defendant's duty to produce a reasonably safe punch press could not be delegated to plaintiff's employer and the proximate cause of plaintiff's injury was a condition of the product.

The machine here involved is commonly referred to as a punch press. It is capable of supplying a pressure equivalent to 45 tons. It has an open back which permits the operator to feed it from the back or the sides as well as from the front, depending on the type of process required. It is described as inclinable because it can be tilted toward the rear or front for performance of certain operations. This press was manufactured by defendant sometime during 1956 and was sold to Hammond during that same year. The press was sold and delivered to Hammond without certain parts which were necessary for its operation. The movable part of the press, which descends forcefully during its operation, is called a ram. The table or bottom portion to which the ram descends is an anvil. A die set must be fitted to the ram. The type of die required by the purchaser is then fitted within the die set. A die set is also attached to a bolster which is on the anvil or lower part and a corresponding die is inserted into the lower die set.

When thus equipped, this press may be used in a primary or a secondary type of operation. In the primary phrase, raw material is fed into the press and partly fabricated or, in effect, reduced to the desired size of workable parts. In this type of operation, the machine is used automatically. The only function of the operator is to make certain that an adequate supply of raw material is at hand. This type of operation is referred to as primary or automatic.

In the secondary operation, the blank parts previously prepared by the machine are finished by perforation or other process. In this operation the machine must be hand fed by an operator. He must set the part within the pinch area on the lower die so that it will be properly fabricated by descent of the upper die in the die set affixed to the ram. After setting the part, the operator activates the machine by a foot pedal and the ram descends. It lifts automatically and the operator manually re-

moves the finished part. In this secondary or hand operation, the machine may be used in an upright position or inclined toward the rear and the parts may be inserted from the sides, front or back.

Stanton Cheyney, sales manager for defendant, testified that this press was sold by defendant to Hammond without the dies or die set. It was necessary for Hammond to obtain and install its own dies dependent upon the type of operation for which the press was to be used. The press was sold by defendant without installation of any safety device. Counsel for plaintiff questioned the witness as to whether the machine was reasonably safe for use in the secondary or manual type of operation. The witness testified that, in his opinion, the machine was reasonably safe for operation in this manner without the addition of a safety device.

John Lang testified that he was the fabricating superintendent for Hammond. Some 3000 basic operations, of both primary and secondary nature, are performed in the Hammond punch press department. He testified that in the automatic or primary operation of the press, no safety device would be necessary and the machine could be operated with safety; assuming insertion of the proper die sets and dies and availability of electric power. However, he expressed the opinion that the machine would not be reasonably safe for operation by the manual process in any of its secondary functions unless a safety device was installed. In his opinion, the machine would be very dangerous if operated manually without a safety device. Lang testified that the press in question is activated by the operator by pressure on a foot pedal when used in a secondary operation. Also, the press is fitted with a so-called nonrepeat device which makes it impossible for the ram to descend more than once when the foot pedal is depressed. Thus, pressure on the foot pedal is always required for each individual descent by the ram.

Lang also testified that the type of dies with which the machine was to be fitted and the manner of its operation would determine the type of safety equipment that should be used for secondary or manual operation. He made that determination himself on his own judgment. Hammond installed some type of safety device upon every press prior to the time that it was used for secondary operation. After the occurrence in question, Lang inspected the machine and found that the nonrepeat cycle of the press was set and was working correctly.

Plaintiff testified that he was employed by Hammond as a punch press operator commencing in 1956. He was injured on January 16, 1964, some seven years after purchase of the press by Hammond. Plaintiff was quite experienced in this operation and was in the highest classification of punch press operators. At that time, he was using the press in question for fabrication of bakelite parts each approximately 4" x 6". He

was feeding the press in a secondary or manual operation. He had been working about two hours. He was seated on a chair facing the machine. The bakelite parts were preheated by water immersion. The process was that plaintiff would pick up a bakelite piece and seat it on the bottom die with his right hand. He then withdrew his hand from the pinch area and activated the press by stepping on the pedal. The ram would descend, perforate the part and then move upward. Plaintiff then removed the part from the press with his left hand. This was a single stroke machine. This entire operation took about five seconds and plaintiff was expected to fabricate no less than 650 pieces of these parts in one hour. Plaintiff testified that he inserted a part with his right hand and activated the machine. The ram descended. When the ram ascended, he put his left hand into the area to pull out the completed part. The ram then descended again upon his left hand although he testified that he did not depress the foot pedal again.

Plaintiff had worked on other presses for other employers. He testified that different safety devices were used for different jobs rquiring manual operation. Sometimes the operator was provided with a pair of tongs. Other devices used two buttons which it was necessary for the operator to push. Another type of device was that operated by electricity which activated a guard that came down when the ram did. Quite a few of the jobs that he performed involved hand feeding of the press. During his employment at Hammond, there were different safety devices used for different job operations on the same press. Prior to undertaking the operation in question, plaintiff was assisted by a set-up man. He fit the safety equipment to plaintiff and inspected it before the operation started.

In this particular case, Hammond had fitted the machine with a Posson safety device. This mechanism was connected to the ram and also strapped in place around the arms and back of the operator. Every time that the ram came down, the device automatically pushed back the arms of the operator so that his hands would be outside of the danger area. The parties stipulated that at the time in question the safety device failed and became inoperable so that plaintiff's left hand was not pulled out of the way. The superintendent for Hammond testified that, after the occurrence, he found the Posson safety device inoperable and that this was the cause of the accident.

The remaining witness called by plaintiff was an expert engineer. He examined this machine in November of 1970, some six years after the occurrence. He answered a lengthy hypothetical question by expressing the opinion that the machine in question, delivered without any safety device, was not reasonably safe for use by punch press operators. In his

opinion, the Posson device was installed to make certain that the hands of the operator were not within the danger zone when the ram came down.

Plaintiff's second amended complaint alleged that it was the duty of defendant to design and sell a punch press that "\* \* \* could be operated with reasonable safety by punch press operators, \* \* \*" including plaintiff. It alleged that defendant had manufactured and sold a punch press that was unreasonably dangerous in that it did not have affixed thereto, at the time of sale, required adequate safety devices. Plaintiff's own testimony was that the ram descended without the application of pressure on the foot pedal. This is contradicted by other credible testimony that the press had a nonrepeat device in good working order which would have made it impossible for the ram to descend more than once after one depression of the foot pedal. The parties themselves stipulated that the safety device had failed and that plaintiff's hand was thus not removed from the danger zone. It is undisputed that the machine was sold without a safety device as alleged in the second amended complaint. There is also a preponderance of opinion evidence that the machine, when fitted with dies and die sets, could be used with safety in the automatic or primary operation but would be dangerous when used by an operator in secondary or manual operations without some kind of safety device.

■■ The decision in *Suvada v. White Motor Co.*, 32 Ill.2d 612, 210 N.E.2d 182, is generally cited for establishing the elements essential to strict tort liability. It is incumbent upon a plaintiff in this type of case to prove that his injury "\* \* \* resulted from a condition of the product, that the condition was an unreasonably dangerous one and that the condition existed at the time it left the manufacturer's control." 32 Ill.2d at 623.

■■ However, in the case at bar, the question before us is a specialized modification or an extension of the general doctrine of strict tort liability to cover a situation in which the manufacturer has sold his product without the addition of any type of a safety device. The decision in *Dunham v. Vaughan & Bushnell Mfg. Co.*, 42 Ill.2d 339, 247 N.E.2d 401, furnishes a theoretical basis on which to consider the liability in the case at bar. There, the court considered strict liability of the manufacturer of a steel hammer which chipped and broke, injuring plaintiff, after some 11 months of use. The court held that the issue of whether the hammer was defective and therefore unreasonably dangerous was one of fact for the jury. A judgment for plaintiff was affirmed. The court carefully defined the term "defective" as having reference to products "\* \* \* which are dangerous because they fail to perform in the manner reasonably to

be expected in light of their nature and intended function." 42 Ill.2d at 342.

Applying this principle to the case at bar, the central issue here involves a determination of whether the punch press was so defective at the time it left the manufacturer's control as to create an unreasonably dangerous situation for the operator thereof; or, in other words, whether the press failed to perform in the manner reasonably to be expected in the light of its nature and intended function. (See 42 Ill.2d at 342.) The evidence shows that the punch press was not unreasonably dangerous, and therefore not defective, when it left defendant's control. When the needed die sets and dies were appended, the machine was not dangerous when used for an automatic or primary operation. On the other hand, when used for any type of secondary operation, which required insertion of the operator's hands within the danger zone, the machine was dangerous. This was not a defect because, in its secondary or manual operation, the machine did not fail to perform in a manner reasonably to be expected in the light of its nature and intended function.

The record shows that the machine could be made reasonably safe in the secondary operations by the use of a safety device. The kind and type of safety device necessarily varied with the manner in which the machine was set up and the type of function that it was to perform. These devices varied from the use of a pair of tongs for insertion into the pinch area to sophisticated electronic machines which would activate a guard in front of the ram. The precise type of device varied with the type of manual operation in which the machine was to be used. Under these circumstances, if the doctrine of strict liability were extended to cover the situation at bar, the manufacturer of devices of the type here involved would be placed in the impossible position of being compelled to furnish a number of different safety devices covering every conceivable type of manual or secondary operation of the machine.

We believe that the applicable principles may be stated as follows: ■■■ where a machine is unifunctional and is unreasonably dangerous in performing this single function without the addition of a safety device, it is defective under the *Dunham* definition and the manufacturer has a duty to supply such a device with the machine at the time that it leaves his control. In such case, an acceptable safety device should be deemed an integral and indispensable part of the machine. On the contrary, where the machine is multifunctional and where different types of safety devices would necessarily be required to obtain reasonable safety in performing these various functions, no duty should be imposed upon the manufacturer to provide any safety devices before the machine leaves his control. In the latter type of case, the machine would

not be defective when it left the control of the manufacturer because it would perform in the manner reasonably to be expected in the light of its nature and intended diverse functions. Therefore it would not be unreasonably dangerous.

In other words, the unifunctional machine is defective and therefore unreasonably dangerous without application of the safety device. The multifunctional machine is not defective and therefore not unreasonably dangerous merely because of the absence of all of the varied safety devices which might or might not be required for its safe operation. The essential element of reasonability cannot be disregarded.

We believe that the above analysis is supported by the cases. It is our opinion that the results reached in the following few cases bearing upon this issue may be reconciled by application of the above stated principle. In *Weiss v. Rockwell Mfg. Co.,* 9 Ill.App.3d 906, 293 N.E.2d 375, this court considered strict liability for a woodworking machine which was allegedly defective and dangerous because the manufacturer did not provide certain safety accessories. This court held that no liability was imposed upon the manufacturer. Regarding the failure of the manufacturer to provide these accessories, we stated (9 Ill.App.3d 906, 912):

> "Implicit in the first reason ascribed is the *duty* of the manufacturer to recommend to or provide every buyer of the shaper certain accessories. Needless to say; this would require the manufacturer to confer with every prospective buyer and make a judgment, at his peril, of what the buyer needed. Alternatively, the manufacturer would be under a duty to recommend to or provide the buyer *all* of the accessories available *regardless of how limited was the intended use.* No case has been cited, nor do we think one exists, extending the doctrine of strict liability to this extreme."

The decision in *Weiss* illustrates exemption of the manufacturer from the duty to furnish a number of varied safety devices which might be required for the safe operation of a multipurpose machine.

An illustration of the opposition situation involving a punch press limited to the performance of one type of function is found in *Bexiga v. Havir Mfg. Corp.,* 60 N.J. 402, 290, A.2d 281. Plaintiff's hand was injured in manual operation of a punch press. An expert mechanical engineer testified for plaintiff that there was a custom of the trade not to equip punch presses, such as the one there involved, with safety devices which were later installed by the purchaser. The witness assailed this practice and testified that there was a push button device which "* * * would be appropriate for any of the machine's normal uses." (See 290 A.2d at

283.) The court imposed liability upon the manufacturer. The court stressed the fact that one type of safety device was appropiate for all of the normal uses of the machine in question. (See 290 A.2d at 285.) We believe that the same result would be reached by this court on facts such as presented in *Bexiga* where the evidence showed that there was one type of device which would render the machine safe for all of its normal operations. *Bexiga* stands for the proposition that the manufacturer has a duty to supply a safety device "where it is feasible for him to do so" (290 A.2d at 285); as it generally is in the case of a unifunctional machine.

Another similar case is *Moren v. Samuel M. Langston Co.*, 96 Ill.App. 2d 133, 237 N.E.2d 759, where plaintiff was injured in operation of a "printer-slotter machine." A judgment for defendant was reversed and the cause remanded because the trial court had excluded expert testimony as to various types of safety devices that were readily available for installation upon the machine by the manufacturer. So far as we can ascertain, this machine was a unifunctional machine which was used only to slot and print cardboard for boxes. It was defective and therefore unreasonably dangerous for operation because the manufacturer had supplied an insufficient safety device. There, the manufacturer knew in advance the single purpose for which the machine would necessarily be used. In the case at bar, the machine was adapted for use with different dies and for varying processes, all requiring different safety devices.

Both sides cite, and have commented extensively upon, *State Stove Mfg. Co. v. Hodes*, Miss., 189 So.2d 113. There, the manufacturer sold a water heater to a contractor. The heater was delivered without a safety value but with instructions directing the contractor to supply and install such mechanism. The contractor installed without the safety valve and the heater exploded. In suit by the homeowner against the contractor and the manufacturer, the majority of the court found that the contractor was strictly liable but that the manufacturer was absolved. A dissenting opinion agreed with the result concerning the contractor but took the position that the manufacturer was also liable. Certain aspects of the decision regarding negligence have no application here. Also, we need not be concerned with the holding by the dissent that the duty of the manufacturer to append the safety device was nondelegable and could not be shifted to the contractor. We believe that this court would probably reach the same result as the dissent, but only on the theory that this stove was a unifunctional instrumentality which was defective and therefore unreasonably dangerous, without application of the safety valve, so that there was a duty upon the manufacturer to install this type of safety device.

Plaintiff cites *Cunningham v. MacNeal Memorial Hosp.*, 47 Ill.2d 443, 266 N.E.2d 897, not because of factual similarity, but to establish a theoretical basis for plaintiff's claim. In *Cunningham*, the Illinois Supreme Court applied principles of strict liability to a hospital which supplied defective human blood to its patient. The court imposed liability even though the state of medical science was such that it was impossible for the hospital to detect the presence of hepatitis virus in the blood. The court held that to allow such a defense to strict liability "* * * would be to emasculate the doctrine and in a very real sense would signal a return to the negligence theory." (47 Ill.2d at 453.) Thus, even though the product sold and administered to the patient was defective and even though the hospital was unable by any means to discover the existence of the defect, strict liability was imposed.

■■ On the contrary, in the case at bar, the product was not defective when it left the control of the manufacturer in accordance with the *Dunham* definition. It was only dangerous when used to perform some of its many functions without a suitable type of safety device. This situation could be remedied by use of a proper safety device, but the number and varied types of these devices was such that the duty of supplying the proper type should reasonably rest not upon the manufacturer but upon the purchaser of the machine. In cases involving food products or blood for transfusion, as in *Cunningham*, these substances are unreasonably dangerous and therefore defective because they are ingested directly within the body of the user. Therefore it is crucially imperative that the duty be enforced against the purveyor. No third person has any opportunity to secure safety of the product, as in the case of a machine. In the case at bar, machine necessarily had to be modified by the purchaser by fitting it with die sets and dies before it was ready for use.

■■■ The burden rested upon plaintiff of proving the existence of a duty as a prerequisite to strict liability. (*Fanning v. LeMay*, 38 Ill.2d 209, 230 N.E.2d 182.) Thus, plaintiff's statement that the record does not show that defendant "could not equip the press at the factory with a safety device that could be used for varying operations" is legally ineffective. The basis for imposition of this duty in cases involving strict liability appears from the decisions in *Suvada* and *Dunham* above quoted. As above analyzed, all of the evidence in this case showed that the machine was multifunctional and that the type of device required to make it safe in performing these functions necessarily varied in accordance with the type of dies used and the operation which the machine was performing. The only evidence adduced by plaintiff was that the machine was dangerous in performing all of these varied secondary or manual operations. This fact is virtually self-evident; but it is not, in our opinion, a sufficient basis for the imposition of strict liability. We, there-

fore, conclude that the motion of defendant for judgment n.o.v. should have been granted.

In view of the result thus above reached, we need not consider defendant's contention that the sole proximate cause of plaintiff's injury was an allegedly defective safety device. Also, since we have determined that defendant had no duty to append a safety device to the machine, we need not consider the point raised by plaintiff that the duty of a manufacturer in this regard may not be delegated.

The judgment in favor of plaintiff is reversed and the cause remanded to the trial court with directions that the motion of defendant for judgment n.o.v. be allowed.

Reversed and remanded with directions.

BURKE, P. J., and EGAN, J., concur.