BROADUS SCOTT, a minor, by CHARLOTTE SCOTT, his mother and next friend, Plaintiff-Appellee, *v.* DREIS & KRUMP MANUFACTURING Co., Defendant-Appellant.

(No. 58240;

First District (2nd Division)—March 11, 1975.

972

DOWNING, P. J., specially concurring.

Kirkland & Ellis, of Chicago (Caryl P. Bonotto and Gary M. Elden, of counsel), for appellant.

James A. Dooley, of Chicago, for appellee.

Mr. JUSTICE STAMOS delivered the opinion of the court:

This is a personal injury action based upon strict tort liability. Plaintiff, Broadus Scott, was injured while operating a press brake manufactured by defendant, Dreis & Krump Manufacturing Co., and sold to the plaintiff's employer, Hasco Electric Company. After a jury trial, judgment was entered for plaintiff in the sum of $125,000. Defendant appeals and presents three principal contentions: (1) the trial court erred in not considering, and not allowing the jury to consider, the defense theory that the press owner, rather than the press manufacturer, had the responsibility for selecting the appropriate safety devices; (2) the trial court erred in preventing the jury from considering the evidence on assumption of risk (3) plaintiff's closing argument was prejudicial and deprived defendant of a fair trial. The facts follow.

Emmett McCarthy, executive vice president of Dreis & Krump Manufacturing Co., was called by plaintiff as an adverse witness. He testified that the machine was manufactured in 1955 and sold to Hasco Electric Company in the same year. He inspected the machine in 1969, approximately 3 years after the injury to plaintiff.

The machine in question is referred to as a press brake. Its function is to bend and shape metal. The press itself is approximately 8 feet wide and 6 feet high. During operation, the ram, the movable upper section of the press, descends upon the bed or lower section. Dies are attached to the ram and the bed. When the ram descends upon the bed, the dies press the metal into the desired shape. The area between the ram die and bed die is referred to as the "point of operation." Without the insertion of the dies, the ram and bed are between 9 and

12 inches apart. When dies are inserted the opening varies from zero to 6 inches. The press can accommodate innumerable dies, the size and function of which may vary.

The press is electrically powered, and has an on-off switch. The switch does not activate the ram, but merely powers the motor. The actual engaging mechanism is called a treadle. The treadle is a lever on a long shaft which is connected to the clutch and operated through the use of a foot pedal. The operator depresses the foot pedal, the clutch is engaged, and the gearing mechanism causes the ram to come down. When the foot pedal is released the clutch is disengaged and simultaneously a braking mechanism is engaged. The foot pedal itself is not fixed, but may be moved along the length of the press to accommodate the position of the operator.

The witness testified that when the foot pedal is released, the ram stops immediately rather than first completing an up or down cycle. This permits the operator to "inch" or jog the ram downward. Although the witness stated that the ram would not continue to operate when the electrical current was shut off, he did acknowledge that the flywheel would continue in motion for a certain period of time even though the power was turned off. He further acknowledged that the inertia of the flywheel after the power is cut could be sufficient to cause movement of the ram, if, in addition, the clutch were engaged.

Joseph De Lucca, a professional engineer, testified on behalf of plaintiff as an expert witness. He stated that he examined the press brake at Hasco Electric Company in May 1966, approximately 2 weeks after the incident. It was not equipped with any safety device even though various safety devices were available and commonly used in the industry to prevent injury to the operator. One safety device consists of a guard placed in front of the point of operation. The guard has a small slit opening through which the material is pushed, thus rendering it impossible for the operator to put his hands between the dies. Other machines have dual controls which require the operator to keep both hands occupied when he uses the machine. In his expert opinion, the press brake was not in a reasonably safe condition for the operator.

On cross-examination, the witness stated that the press brake is versatile in its operations; it could shape material as small as the numbers on a clock or shape material almost 8 feet wide. Because of its versatility, he admitted that any one of the various safety devices only becomes reasonable in light of the manner in which the machinery is set up for the particular operation. He further admitted that since the owner of the machine determines its setup, the owner determines what safeguard is appropriate.

Irving Hazard, a registered professional engineer, testified as an expert witness. In his opinion the machine was in an unreasonably dangerous condition for the reasons that the machine had no guards or safety devices and that the inertia of the flywheel could cause the machine to operate even though the motor has been turned off. With respect to the latter reason, the witness stated that a lock-out device could be installed to prevent the machine from operating after the electrical current is turned off. One such lock-out device would be a simple solenoid switch which would lock the clutch in its disengaged position whenever the electrical power is interrupted. The solenoid switch is inexpensive and has been known to science and industry since the latter part of the nineteenth century. The witness further stated that there are hydraulic presses which do not have flywheels. When a hydraulic press is switched to the "off" position it cannot continue to operate.

The witness also testified to various shield and guard devices, dual controls, and photoelectric mechanisms. The technology for these devices existed prior to 1945. Plaintiff then introduced into evidence the 1960 American Safety Standards Code. Mr. Hazard read the following sections of the Code:

"5. Safeguarding at the Point of Operation. 5.1. General. Each press should be equipped and operated with a point of operation guard or a point of operation protective device for every press operation performed, except where the point of operation is limited to an opening of ¼ inch or less.

5.2 Point of Operation Guards. Design and Construction. Every such guard should be reliable in construction, application and adjustment. The guard should be attached to the press or to the die. The guard shall not offer any accidental hazard. It shall be so designed and constructed as to facilitate inspection and to minimize the possibility of removing or misusing essential parts.

5.2.5. Fixed Barrier Guards. A fixed barrier guard shall enclose the point of operation in conformity with Table 1. It shall be secured to the press frame by fasteners.

5.3.3.1. Gate or movable barrier device. Sequence of Operation. The gate or movable barrier device shall enclose the point of operation before power is transmitted to the slide.

5.3.3.2. Interlocking. Gate or movable barrier devices shall be interlocked with a clutch control mechanism so that the downward motion of the slide cannot begin until the device encloses the point of operation.

6. Power press action equipment. 6.1. Power Pedal Cover Guard. Each pedal or foot switch on foot operated power presses shall

be provided with a cover or guard to prevent the operation of the press except by a downward pressure of the operator's foot or an equally effective mechanism shall be provided."

The pedal on the machine in question was unguarded.

On cross-examination, the witness stated that an infinite number of dies could be utilized in the machine. He also stated that there are many press operations where the raw material is automatically fed into the machine and automatically ejected by the use of a kick-out die. The witness stated that he was not familiar with the 1971 Code of American National Standard Safety Requirements for the Construction, Care and Use of Mechanical Power Presses. The witness read the following sections of the 1971 Code:

"Section 5. Safeguarding the Point of Operation. 5.1. It shall be the responsibility of the employer to provide and insure the usage of either a point of operation guard or a properly applied and adjusted point of operation device on every operation performed on the mechanical power presses.[1]

5.1.1. Die Builder. It shall be the responsibility of the die builder to design and construct all new dies to eliminate the need for the operator to place his hands or fingers within the point of operation.

6.1.2. Employer. A primary objective of this standard is to eliminate exposure of operator's hands or fingers to the hazards within the point of operation. Only the employer can regulate the dies used and the manner in which they are operated. The requirements of 6.1.2. are therefore critical in eliminating point of operation injury to the operator."

Plaintiff was allowed to read the deposition testimony of Paul Dragastin, staff engineer for defendant. He stated that the flywheel has enough inertia to continue to operate for 2 or 3 minutes after the power was shut off. He did not recall placing a warning on the machine to that effect, and within this 2- to 3-minute period the ram could be activated by depressing the foot pedal.

At the time of the occurrence, May 17, 1966, plaintiff was 19 years old. He had worked at Hasco Electric Company 3 to 4 weeks prior to the occurrence. This was his first experience in a factory. He was from North Carolina and had never operated machinery before other than a power mower.

In operating the machine, plaintiff would stand opposite the center

---

[1] Section 5.1 was admitted into evidence during defendant's case in chief and its contents were argued to the jury as a defense theory.

of the press, obtain material off a skid to his left, place it on the bed, and slide it into the machine. The backstop prevented the material from going beyond a certain point. The metal he had used that particular day was approximately 5 feet long and 2 feet wide and about as thick as a quarter. After inserting the metal sheet he would push the foot pedal, and the material would be pressed by the action of the ram and the bed.

On May 17, 1966, about 3 P.M., there was a coffee break. He went behind the machine and turned off the electric switch. He then proceeded to remove the material from the bed when the ram came down on his right hand. About 2 minutes elapsed from the time he turned off the switch until the accident occurred. He stated that he must have contacted the treadle.

On cross-examination, the witness testified that at the time of the occurrence he did not know that the machine could continue to operate after the current was shut off. He stated, however, that on one or two occasions, he had seen fellow employees activate their machines by switching off the current and "mashing the foot pedal." With respect to the injury at bar, plaintiff's contact with the foot pedal was inadvertent rather than deliberate.

Emmett McCarthy was the only defense witness. Defense counsel attempted to ask the witness whether it was the responsibility of the employer to provide and insure the usage of safety devices at the point of operation. An objection to the question was sustained. Additionally, defense counsel was not permitted to introduce into evidence a section of the Department of Labor's Occupation Safety and Health Standards.[2] The court based its ruling, in part, upon its belief that the Federal regulations exempted press brakes, and in part, upon its belief that the regulations were not relevant to the issue of whether the manufacturer had a duty in 1955 to place a safety device on the machine.

We consider first plaintiff's contention that the appeal should be dismissed for want of jurisdiction. The factual setting giving rise to the contention requires some explanation. The common-law record and transcript of proceedings were filed in this court on November 9, 1972. Pursuant to Supreme Court Rule 329, defendant subsequently filed a motion in the circuit court seeking to correct the date of entry of judgment in the record on appeal from May 24 to May 25, 1972. On May 17, 1973, plaintiff filed in this court his motion to dismiss on the ground that judgment was entered on May 24, 1972, and defendant did not file his post-trial motion until June 24, 1972 (31 days after judgment was

---

[2] 36 Fed. Reg. 10644 (1971), sec. 1910.217(c)(1). This section was identical to section 5.1 of the 1971 American National Standard Safety Requirements, *supra*.

entered) in violation of section 68.1(3) of the Civil Practice Act (Ill. Rev. Stat. 1971, ch. 110, par. 68.1(3)) which, in part, provides: "Post-trial motions must be filed within 30 days after the entry of judgment * * *." Prior to a decision on plaintiff's motion in this court, the circuit court, after a hearing, granted defendant's motion finding that the judgment of record was entered May 25, 1972. Plaintiff's appellate motion was then taken with the case.

The circuit court held several hearings on defendant's motion; various witnesses and all relevant documents were examined. The hearings on the motion revealed the following:

At approximately 5 P.M. on May 24, 1972, the jury returned a verdict in favor of plaintiff for $125,000. At that time, the presiding judge orally pronounced judgment on the verdict. Although no request for a written judgment order was made, the pronouncement was entered in the minute book of the trial court by the deputy clerk. The date of entry in the minute book was originally stamped May 24, but was manually altered to a longhand May 25 date. The deputy who made the entry was not the regularly assigned clerk of the trial judge and is since deceased. Consequently, no explanation for the alteration was proffered. The minute book is normally in the custody of the courtroom's deputy clerk who, after the appropriate entry has been made, takes the minute book to the clerk's office. Whether this is accomplished the same day of the oral pronouncement of judgment or the following day depends upon the time the jury returns its verdict and the individual habits of the judge's deputy clerk. The clerk's office then proceeds to transcribe the minute book entry to the docket and the law record book. Entries in the law record are made between the hours 9 A.M. and 3:30 P.M. If a verdict is returned after 5 P.M., the "night crew" will transcribe the entries of the minute book to the docket, and the following morning it is transcribed in the law record. When the clerk's office prepares a record for appeal, the date of the judgment is taken from the law record book. In the present case, the docket shows a May 25 date, and the typed draft order in the law record book originally contained the typed date May 25, but was manually altered to a long-hand May 24 date. The entries in the law record are sequential, with all the work of one day on a consecutive series of pages. The May 25 orders run from pages 137 to 155 with the instant order appearing on page 147. The book is bound and it would be impossible to insert a May 24 entry amongst the May 25 entries without unbinding the book.

The Chicago Daily Law Bulletin of May 26 listed the judgment as entered on May 25, and the Cook County jury verdict reporter listed the case as being concluded on May 25. On May 25, the Chicago Title

& Trust Company obtained the date of May 25 from the clerk's minute book. The above was admitted into evidence to show that any alteration to the minute book was made on or before May 25, 1972.

The trial court found that the judgment was entered in the deputy clerk's court minute book on May 24 and in the law record book on May 25. There was no specific finding as to the cause of the alterations, but from the record we think it clear that they resulted from some administrative mishap on or before May 25, 1972. Based upon these findings of fact, the trial court held that under Supreme Court Rule 272, the judgment was entered of record on May 25, 1972, and ordered the clerk to amend the record on appeal. Supreme Court Rule 272 (Ill. Rev. Stat. 1971, ch. 110A, par. 272) provides:

> "If at the time of announcing final judgment the judge requires the submission of a form of written judgment to be signed by him, the clerk shall make a notation to that effect and the judgment becomes final only when the signed judgment is filed. If no such signed written judgment is to be filed, the judge or clerk shall forthwith make a notation of judgment and enter the judgment of record promptly, and the judgment is entered at the time it is entered of record."

In applying Rule 272, the trial court held that the court's minutes were more or less an informal record book, and that the judgment became formally of record when it was entered in the law record.

■■ When no written judgment order is requested, Supreme Court Rule 272 states that a "judgment is entered at the time it is entered of record." In the present controversy, there is no dispute that the judgment was entered in the law record on May 25, 1972. It is plaintiff's position, however, that the judgment became of record when it was entered in the court's minute book. We disagree. The second sentence of Rule 272 is applicable here. Simply from an analysis of the language of that sentence, we think the deputy clerk's entry in the court's minute book on May 24, 1972, was the "notation of judgment" forthwith. The prompt entry of judgment of record clearly refers to a subsequent act; and "the judgment is entered at the time it is entered of record," not at (or as of) the time the judgment was orally rendered nor at (or as of) the time the notation of judgment was forthwith made.

■■■ Prior to the enactment of Rule 272, a pronouncement in open court constituted an entry of judgment in a law case, and a record entry constituted an entry of judgment in an equity case. (*Freeport Motor Casualty Co. v. Tharp*, 406 Ill. 295, 94 N.E.2d 139, *overruled on other grounds, People ex rel. Schwartz v. Fagerholm*, 17 Ill.2d 131, 161 N.E. 2d 20.) Rule 272 was designed to make the record entry date controlling

for all judgments and thereby, as stated by the Committee Comments, "remove any doubt as to the date a judgment is entered." The Rule, however, does not explicitly fix the time at which a judgment is entered of record in circumstances where no written judgment order is requested by the court. Although the rule is relatively new and the operative phrase —"entered of record"—has yet to be definitively construed, this court in *Davidson Masonry & Restoration, Inc. v. J. L. Wroan & Sons, Inc.*, 2 Ill.App.3d 524, 275 N.E.2d 654, stated, by way of dicta, that a docket entry or memorandum made by the trial judge is not an entry of record within the meaning of Rule 272. Similarly, we judge that an entry in the court's minutes is not within the operative phrase of Supreme Court Rule 272.

■■■ In interpreting the operative phrase of Rule 272, we are guided by the rule of construction that statutes should be construed with reference to the principles of the common law, and it will not be presumed that an innovation thereon was intended farther than is specified or clearly to be implied (*Reid v. Chicago Railways Co.*, 231 Ill.App. 58); and words and phrases having well-defined meanings in the common law are interpreted to have the same meanings when used in statutes dealing with the same or similar subject matter as that with which they were associated at common law. Sutherland, Statutory Construction § 50.03 (4th ed. 1973).

Earlier decisional law leads to the conclusion that an entry of judgment in the court's minute book is not an entry of record under Supreme Court Rule 272. In *Freeport Motor Casualty Co. v. Tharp*, our supreme court stated:

> "When, then, was this judgment rendered? Although it is clear that the minutes, memoranda, or docket entries made, even by the judge upon his own docket, do not form a part of the official records of the court, yet they do afford a proper means of amending the record and assisting the clerk in accurately making up the record. 406 Ill. 295, 300.

Similarly, in *Norris Grain Co. v. Brown*, 318 Ill.App. 646, 48 N.E.2d 435, the court held that the minutes of the judge's docket do not constitute part of the record, and in *McDowell v. County of Gallatin*, 329 Ill.App. 513, 69 N.E.2d 359, the court stated that the court's minutes are no part of the record on appeal, and the reviewing court should dismiss an appeal taken from the minutes of the trial judge.

■■ The rule that the court's minutes are not part of the record is supported in reason as well. Unlike a written judgment order, the court's minutes are not found in the file of the case, nor are they readily available to the public at a centralized location. The law record, on the other

984

hand, is conveniently located for· the benefit of the litigants and interested parties, and it is the document relied upon by the clerk's office in making up the record on appeal. Accordingly, under Supreme Court Rule 272, we hold that when the trial judge does not require the submission of a written judgment order, a judgment is entered of record when it is recorded in the law record book. Generally this entry will be made on either the same or following day of the oral pronouncement of judgment and its entry into the minute book. In any event, the judgment is of record only at the time of the actual entry in the law record book. We therefore deny plaintiff's motion to dismiss the appeal.

■■ Turning then to the substantive issues raised in the appeal, defendant's initial series of contentions is that the court erred in refusing to consider, or to allow the jury to consider, that press owners rather than press makers had the responsibility for selecting the appropriate safety devices. It is first asserted that the trial court should have directed a verdict for defendant after plaintiff's expert, De Lucca, admitted that the proper safety device cannot be selected until the press owner determines how the press will be used. Defendant asserts that, since each safety device is appropriate for some uses of the press, but inappropriate for other uses, a manufacturer has no duty to install safety guards on a multipurpose press. In support of its position, defendant relies mainly upon *Rios v. Niagara Machine & Tool Works*, 12 Ill.App.3d 739, 299 N.E.2d 86, *affirmed*, 59 Ill.2d 79, 319 N.E.2d 232.

We initially note that although defendant's argument devotes considerable space in attempting to demonstrate that there is no universal safety device which can be added to the press, defendant fails to address itself to the significance of the condition and operation of the foot pedal and the engaging mechanism of the press. The record reveals that the foot pedal could engage the clutch and thus activate the ram even after the electrical currect was shut off. The evidence also demonstrated that a cover or guard could be employed to prevent an accidental depression of the pedal, or that a simple lock-out device could be used to prevent the ram from descending after the current had been turned off. It is undisputed that the press had neither a pedal guard nor a lock-out device. This aspect of the machine was integral to its normal operation and was not dependent upon the particular die set-up or function which the machine was to perform. This particular defect was unrelated to the multifunctional nature of the machine and the question of whether the unguarded foot pedal and the engaging mechanism were unreasonably dangerous was an issue to be determined by the trier of fact. (See *Gelsumino v. E. W. Bliss Co.*, 10 Ill.App.3d 604, 295 N.E.2d 110.) Since the jury could find the machine to be unreasonably dangerous for de-

fects unrelated to the machine's multifunctional nature, defendant has failed to bring itself within the rule which it advocates.

Moreover, we must disagree with defendant's assertion that a manufacturer has no duty to install safety guards on a multipurpose machine. Defendant relies upon the appellate court decision in *Rios v. Niagara Machine & Tool Works*, 12 Ill.App.3d 739, 299 N.E.2d 86, and its affirmance by the Illinois Supreme Court in 59 Ill.2d 79, 319 N.E.2d 232. In *Rios*, plaintiff was injured on a punch press when, while recovering a completed part, the ram descended upon his hand. The machine was similar to a press brake, and similar safety devices could be installed. In this particular instance, the employer had installed a Posson or pullout device. This device was strapped to the arms and back of the operator and would automatically push the arms of the operator outside the danger area whenever the ram descended. The parties stipulated that at the time of the occurrence the safety device failed and became inoperable. After a jury verdict in favor of plaintiff, defendant appealed and contended that plaintiff failed to prove the necessary elements of a strict-liability claim, and that the sole cause of plaintiff's accident was the failure of the safety device installed by the employer. This court decided the case on the issue of whether defendant had a duty to install safety devices. We held that where machines are "multifunctional and where different types of safety devices would necessarily be required to obtain reasonable safety in performing these various functions, no duty should be imposed upon the manufacturer to provide any safety devices before the machine leaves his control." (12 Ill.App.3d 739, 745.) The supreme court granted leave to appeal.

In that court, plaintiff argued that the malfunction of the Posson device is not, as a matter of law, an intervening independent cause which will relieve defendant from liability for marketing an unreasonably dangerous machine because (1) the manufacturer is under a nondelegable duty to make its products safe for their intended uses and cannot expect others, such as plaintiff's employer, to remedy a dangerous condition existing when it left its control, and (2) it was foreseeable that safety devices installed by users of this machine might prove ineffective. In response to the contentions advanced by plaintiff, the supreme court, citing *Bexiga v. Havir Manufacturing Corp.* (1972), 60 N.J. 402, 290 A.2d 281, agreed that where a device is unreasonably dangerous absent a safety device, the manufacturer is under a nondelegable duty to install such a device. However, the court found the rule inapplicable to the situation presented:

> "While we agree that a manufacturer is under a nondelegable duty to produce a product which is reasonably safe, that rule had

no application to the facts of this case for the simple reason that a safety device was attached to this punch press by plaintiff's employer. * * * Once this device had been attached to the machine, whatever unreasonably dangerous conditions existed when it left the defendant's control by reason of the absence of safety devices were fully corrected." (59 Ill.2d 79, 85.)

Thus, the court affirmed the judgment of the appellate court upon the ground that there was no evidence which causally connected the plaintiff's injury with the unreasonably dangerous condition of the machine alleged in the complaint.[3] In judicial dicta, the court further commented:

"Suffice it to say that our affirmance of the appellate court judgment should not be construed as an acceptance of [their] theory. Although the multifunctional nature of a product would be a factor to consider in determining whether a product is unreasonably dangerous, it would not necessarily be decisive of that question." 59 Ill.2d 79, 86-87.

■■ Guided by the language of our supreme court in *Rios*, we hold that a manufacturer is under a nondelegable duty to produce a product which is reasonably safe and that such duty is not obviated when a multifunctional machine is placed into the stream of commerce. (See also *Krammer v. Edward Hines Lumber Co.*, 16 Ill.App.3d 763, 306 N.E.2d 686.) Although the multifunctional nature of a product is one factor to be considered by the trier of fact in determining whether the product is unreasonably dangerous, it does not operate to delegate the duty of a manufacturer to the conduct of third parties.

In *Rivera v. Rockford Machine & Tool Co.*, 1 Ill.App.3d 641, 274 N.E.2d 828, plaintiff, the operator of a press molding machine lost his hand when the machine closed on his hand while he was in the act of removing material. The malfunction of the machine was caused by the fracture of a piston rod which was not an original component of the machine, but was manufactured and installed by plaintiff's employer.

---

[3] In its supplemental brief, defendant takes the position that *Rios* is indistinguishable from the case at bar regarding the issue of proximate cause. It is argued that the failure of Hasco Electric Company (Hasco) to install any safety device on the press in question is identical to the employer's installation of an inoperable safety device in *Rios*. Contending that Hasco's act of omission is equivalent to the employer's act of commission in *Rios*, defendant concludes that the sole proximate cause of the injury rests upon Hasco's failure to act. We disagree. The supreme court's holding on the issue of proximate cause is addressed to the character of the instrumentality, not the conduct of the employer. In the instant case, unlike *Rios*, the unreasonably dangerous condition of the press alleged in the complaint existed both at the time the press left defendant's control and at the time of plaintiff's injury.

Disposing of defendant's contention that it was under no duty to incorporate certain safety devices as a matter of law, the court stated:

"While it is true that the question of whether a duty exists is a question of law for the court, the only duty with which the court is concerned in a strict liability case is the defendant's duty to place into the stream of commerce only those articles which are not unreasonably dangerous when used for their intended purpose. This was the sole duty imposed. Resolution of the question of whether defendant's machine was unreasonably dangerous for failure to incorporate certain safety devices which plaintiff's evidence shows were available at the time the (machine) left defendant's control was the function of the jury as trier of fact. Their finding as to this question, when considered in connection with defendant's duty, determines the issue of liability." 1 Ill.App.3d, 641, 647.

In the instant matter, none of the recognized safety devices was incorporated into, or provided with, the press brake. Evidence of the multifunctional nature of the machine was presented to the jury who resolved the issue of whether the press brake was unreasonably dangerous against defendant. It was, we judge, properly within the province of the jury to find the press brake unreasonably dangerous both with respect to those deficiencies which were related to its multifunctional nature and, as earlier stated, with respect to those deficiencies—the lack of a foot-pedal guard or lock-out device—unrelated to its potentially multipurpose operations.

In conjunction with the above argument, defendant alternatively argues that, if it was not entitled to a directed verdict, it should have been permitted to fully present to the jury that it was the sole responsibility of the press owner, not the manufacturer, to install safety devices. Defendant's first complaint concerns a section of the 1971 Department of Labor's Occupational Safety and Health Standards which provides that "it shall be the responsibility of the employer to provide and insure the usage of either a point of operation guard or a properly applied and adjusted point of operation device on every operation performed on the mechanical power presses." [4] Similarly, Mr. Hazard was not allowed to testify that it was the responsibility of the press owner to equip the machine with safety devices.

---

[4] The trial court sustained an objection to this section although the identical section in the 1971 Code of American National Standard Safety Requirements was admitted into evidence and argued to the jury. In light of our subsequent holding, and in the interest of brevity, we make no attempt to reconcile the trial court's action.

■■■■ We believe that the trial court correctly refused the evidence. As earlier stated, a manufacturer is under a nondelegable duty to produce a product which is reasonably safe (*Rios v. Niagara Machine & Tool Works*, 59 Ill.2d 79, 319 N.E.2d 232), and a machine may be unreasonably dangerous for failure to incorporate safety devices. (*Rivera v. Rockford Machine & Tool Co., supra.*) It therefore follows that a manufacturer cannot introduce evidence to show that the duty to incorporate the appropriate safety devices falls upon the purchaser of the product. To allow such evidence in circumstances where the appropriate safety devices have not been provided to the purchaser would inject into the case an improper conclusion of law so far as the issues of strict liability are concerned. (See 31 Am. Jur.2d *Expert and Opinion Evidence* § 69 (1967); *Hoener v. Koch*, 84 Ill. 408.) The evidence here was not relevant to the issue of whether the press was unreasonably dangerous and improperly sought to delegate the duty of the manufacturer to the conduct of a third party.[5]

Defendant, however, advances another reason why the 1971 Occupational Safety and Health Standard should have been admitted into evidence. He argues that plaintiff's counsel stipulated to their admission. This contention is premised upon the following: When plaintiff attempted to introduce the 1960 Standards, defendant objected on the ground that the 1960 Standards were misleading on the "state of the art" in 1955. Defendant argued that there was a 1948 and 1971 version of the Standards, one of which would have applied at the time the press was manufactured, and the other which showed the most current thinking on the subject. In response to these objections, plaintiff's counsel stated that he was using the 1960 Standards "solely for the purpose of showing the character of the instrumentality." When defendant's counsel still objected that "it's not the latest code, I have to get the latest code," plaintiff's counsel replied: "If you want to introduce it, I have no objection." On that representation, defense counsel argues that he ceased to object to the use of the 1960 Standards.

■■■■ In context of the above colloquy, we think that counsel's remark did not amount to a binding stipulation that defense counsel could introduce into evidence a Federal regulation which placed the duty of installing safety devices upon the employer. As the record makes clear, at the time of the remark, counsel was unaware of the purport of that particular section and assumed that the "latest code" addressed itself to the character

---

[5] It is important to stress that the evidence sought to be introduced alluded to the duty of the employer to the employee as promulgated by federal regulation in 1971. It did not relate to the standards of machine design (see *Pyatt v. Engel Equipment, Inc.*, 17 Ill.App.3d 1070, 309 N.E.2d 225), nor was it probative of the quality of the machine. See *Wallner v. Kitchens of Sara Lee, Inc.* (7th Cir. 1969), 419 F.2d 1028.

of the instrumentality. Furthermore, plaintiff's counsel made clear, earlier in the trial, his position that evidence which attempted to delegate the duty of the manufacturer to plaintiff's employer was improper. A stipulation is an agreement and the court will look to the actual intention of the parties (*Kazubowski v. Kazubowski*, 93 Ill.App.2d 126, 235 N.E.2d 664); like a contract, it must be clear, certain and definite in its material provisions. (*In Re Estate of Moss*, 109 Ill.App.2d 185, 248 N.E.2d 513.) Insofar as it relates to the section in question, counsel's remark shared none of the attributes of a stipulation. Furthermore, we find no merit in defendant's assertion that he was prejudiced by the alleged "stipulation" inasmuch as defense counsel ceased to object to the 1960 Standards, for the reason that the 1960 Standards were properly admitted into evidence. Plaintiff's expert testimony established that the technology for the various standard devices existed prior to the date of manufacture. Standards subsequent to the date of manufacture are admissible to show the feasibility of alternative design. See *Sutkowski v. Universal Marion Corp.*, 5 Ill.App.3d 313, 281 N.E.2d 749.

■■ Defendant next urges that plaintiff's expert witness, De Lucca, was improperly allowed to express an opinion on an ultimate fact, *i.e.*, that the press was not safe. In *Matthews v. Stewart Warner Corp.*, 20 Ill.App. 3d 470, 314 N.E.2d 683, a products liability action, this court held that expert testimony on the ultimate fact of "defectiveness" was proper. Quoting *In re Roberts Park Fire Protection District*, 20 Ill.App.3d 282, 314 N.E.2d 208, this court reiterated:

> " 'It was proper for counsel for both parties to elicit the opinion of expert witnesses regarding the ultimate question before the court. (*Miller v. Pillsbury Co.*, 33 Ill.2d 514, 516, 211 N.E.2d 733, cited in *Moren v. Samuel M. Langston Co.*, 96 Ill.App.2d 133, 142, 237 N.E.2d 759.) Despite early precedents to the contrary, the reviewing courts of Illinois have approved the practice of permitting the expert to express directly his opinion upon ultimate issues on the theory that "since the trier of fact is not required to accept the opinion of the expert, such evidence does not usurp the province of the jury." (*Merchants National Bank v. E. J. & E. Ry. Co.*, 49 Ill.2d 118, 122, 273 N.E.2d 809.) * * *' " 20 Ill. App.3d 470, 479.

Similarly, we find no error in allowing plaintiff's expert witness to state his opinion that the press was not safe.

■■ It is next asserted that the court erred in striking the defense of assumption of risk. A determination of the trial court's action in striking the affirmative defense of assumption of risk must be predicated upon a consideration of the totality of the evidence in its aspect most favorable

to defendant. (*Williams v. Brown Manufacturing Co.*, 45 Ill.2d 418, 261 N.E.2d 305.) The test is necessarily a subjective one and consideration must be given to the user's age, experience, knowledge and understanding, as well as the obviousness of the defect and the danger it poses. *Williams v. Brown, supra.*

At the time of the occurrence, plaintiff was a 19-year-old boy from North Carolina who had worked at Hasco 3 to 4 weeks prior to the incident. This was his first experience with a press and, with the exception of a power lawn mower, he had never previously operated machinery.

The defects in the machine were the lack of various protective safety devices and the fact that the ram could be activated after the electric current was switched off. No evidence was adduced that plaintiff had knowledge of safety devices or that he had observed his press function after the switch was turned off. He had no particular knowledge of electricity and assumed that, when the electrical switch was off, his machine would no longer operate. After plaintiff switched off the machine on the day in question, his contact with the foot treadle was inadvertent.[6]

■■■■ While we agree with defendant's assertion that the trier of fact is not compelled to accept a user's testimony that he was unaware of the danger (*Williams v. Brown, supra*)[7] before the defense is properly submitted to the jury, there must be some evidence which will permit a finding that the one charged with assuming the risk had knowledge of the particular risk, and, comprehending and appreciating such risk, voluntarily took his chances of harm therefrom. (65A C.J.S. *Negligence* § 251 (2) (1966).) Assumption of the risk, as used in comment *n* to Restatement (second) of Torts § 402A (1965) is referred to as voluntarily and unreasonably proceeding to encounter a known danger. Whether the character of plaintiff's conduct is such that he may be deemed to have voluntarily and unreasonably encountered a known risk must necessarily depend upon the particular circumstances of each case. In situations where the nature of plaintiff's employment requires exposure to certain hazards, it would be a *non sequitur* of the policy considerations of strict tort liability to say that plaintiff has voluntarily and unreasonably assumed such hazards by the mere acceptance of his employment. There must, we think, be an element of conscious conduct resulting in the injury which is not satisfied by mere inadvertence or momentary inatten-

---

[6] This gave rise to defendant's "affirmative defense" of misuse which was argued and submitted to the jury.

[7] Defendant urges that since plaintiff had observed other machines operate after the switch was turned off, a jury might conclude that plaintiff knew his press would operate in a like manner.

tion. (*Elder v. Crawley Book Machinery Co.* (3rd Cir. 1971), 441 F.2d 771.) The testimony in the instant case stands uncontradicted that plaintiff's contact with the foot treadle was inadvertent. Defendant does not point out, nor does our search of the record reveal, any facts from which a contrary inference may reasonably be drawn. Therefore, assuming *arguendo* that plaintiff did have knowledge of one of the "defects," his conduct was not voluntary and unreasonable within the meaning of assumption of risk. Accordingly, we concur with the trial court's conclusion that the evidence as a whole so overwhelmingly favors plaintiff that a jury finding for defendant on that issue could never stand.

Defendant finally contends that plaintiff's closing argument was, in several particulars, prejudicial. It is first asserted that plaintiff's counsel generated passion and prejudice against defendant by suggesting that defendant "enjoyed" when workmen had their entire hands cut off. During rebuttal argument, counsel for plaintiff stated:

> "And, he [defense counsel] said, 'Well, he shouldn't have been hurt this way.' What should he have had, his entire hand cut off? Would they have enjoyed that more?"

We initially note that the above argument was in response to a portion of defendant's argument in which defendant argued that if the injury had occurred in the manner stated by plaintiff, he would have lost his entire hand, not just his fingers. Although we hold that the rhetorical question was improper notwithstanding the context in which it was given, we are of the opinion that its prejudicial effect was not of such magnitude that it could not be cured. Here, defense counsel's objection was promptly sustained, the statement stricken, and the jury was specifically instructed to disregard the statement. In view of the prompt measures taken by the court to guard against the argument's prejudicial effect on the jury, we find no reversible error. *Johnson v. Chicago Transit Authority*, 11 Ill. App.3d 16, 295 N.E.2d 573.

Defendant also complains of the following portion of plaintiff's argument:

> "They didn't have anyone here to explain that mechanism. In fact, they didn't have any brochure about this. They didn't have any advertising copy. They had nothing. Everything was gone about this particular machine, and you can bet your bottom dollar that if someone—if they were engaged in a patent suit today about this machine, they'd know where all that material was."

Although, in appropriate circumstances, we recognize that counsel may comment upon the opposing party's failure to produce evidence, we believe that counsel's final remark concerning the "patent suit" skirted the bounds of proper comment. Nevertheless, we do not attribute to it the

importance or the consequences which defendant argues (*Mitchell v. Four States Machinery Co.*, 74 Ill.App.2d 59, 220 N.E.2d 109), and, in the context of the entire trial, we do not consider the comment a ground for reversal.

■■ Additionally, although defendant now objects to several other portions of plaintiff's argument, defense counsel made no objection during argument or in his post-trial motion. We have considered the alleged errors and do not feel that they were of a nature so substantial as to require this court to assess their possible effect despite the absence of objection. See *Belfield v. Coop*, 8 Ill.2d 293, 134 N.E.2d 249.

Lastly, we have examined the various ancillary arguments to the principal contentions asserted by defendant both in its original and supplementary briefs and have found no basis for reversal of the judgment. Accordingly, the judgment of the circuit court is affirmed.

Judgment affirmed.

HAYES, J., concurs.

Mr. PRESIDING JUSTICE DOWNING, specially concurring:

I concur with the result in this case except with the reasoning of my colleagues in reaching their result in denying plaintiff's motion to dismiss this appeal. The majority state that " * * * under Supreme Court Rule 272, we hold that when the trial judge does not require the submission of a written judgment order, a judgment is entered of record when it is recorded in the law record book." I do not think that is what the rule says or means, or if it does, then I submit that the portion of Rule 272 (Ill. Rev. Stat. 171, ch. 110A, par. 272) applicable to the occasion when written judgment orders are not filed should be re-examined.

In this particular case we are dealing with a judgment entered orally by the trial court upon a verdict rendered by a jury in a civil case involving a personal injury. Section 68 of the Civil Practice Act (Ill. Rev. Stat. 1971, ch. 110, par. 68) provides:

"(1) It is sufficient for the jury to pronounce their verdict by their foreman in open court, without reducing it to writing, if it is a general verdict. The clerk shall enter it in form, under the direction of the court.

(2) Promptly upon the return of a verdict, the court shall enter judgment thereon."

As provided in Supreme Court Rule 2 (Ill. Rev. Stat. 1971, ch. 110A, par. 2), " 'Judgment' also includes decree, determination, decision, order, or portion thereof." It is clear to me from the foregoing, a judgment must and can be entered only by the trial court.

In this case there is no dispute that promptly upon the return of the jury verdict on May 24, 1972 at approximately 5 P.M., the trial judge in open court, with a deputy clerk present, pronounced judgment on the verdict. In Cook County it is the custom for the deputy clerk to memorialize the judgments in a minute book maintained for each courtroom. In this case the minute book record contains a stamped entry of May 24 and a manual longhand entry of May 25. As provided in section 68(2) of the Civil Practice Act, the trial court promptly entered judgment. This was the *judicial* act necessary to give effect to the meaning of the term "Judgment" as defined in Supreme Court Rule 2.

But, as I understand the majority opinion, it holds that it is not the date of the *judicial* act which controls, rather it is the actual date the *ministerial* act is performed by the clerk in transcribing that judgment to the law record book which controls. This removes the control for the entry of a judgment from the trial judge to the clerk and opens the door to possible error or abuse—which can be brought about either by neglect or mischief.

The statutory duties of the clerk of a circuit court as set forth in section 14 of "An Act  *  *  *  in relation to clerks of courts" (Ill. Rev. Stat. 1971, ch. 25, par. 14), so far as pertinent, are as follows:

"They shall enter of record all judgments, decrees and orders of their respective courts, as soon after the rendition or making thereof as practicable."

The characterization of the clerk's act in entering or recording a judgment as *"ministerial"* and the distinction between that act and the *judicial* act of rendering a judgment has been a basic concept recognized since the common law. (See *The Governor v. Dodd* (1876), 81 Ill. 162; *Smyth v. Fargo* (1923), 307 Ill. 300, 306, 138 N.E. 610.) In fact the clerks of court for many years have been held liable to any party suffering injury thereby for any failure to perform an official duty. (See *The Governor v. Dodd, supra.*) Thus, in the instant case, if, as the result of the clerk's ministerial act of recording erroneously the date of judgment, a party is denied the right of appeal, the remedy may well be for an action for damages, if any, against the clerk; and, in fact, might well subject the clerk to the penalty provided in section 15 of "An Act  *  *  *  in relation to clerks of courts." Ill. Rev. Stat. 1971, ch. 25, par. 15.

The case of *Freeport Motor Casualty Co. v. Tharp* (1950), 406 Ill. 295, 94 N.E.2d 139, cited by the majority, concerned the question of the effective date of a written judgment order mailed by the trial judge, located in one city, to the clerk at the county seat with an accompanying letter with directions that the order be filed " '*  *  *  the next day there is court in Louisville the appropriate docket entries can be made.' " (406

Ill. 295, 297.) In *Freeport* the order was dated and mailed June 15, 1948, received by the clerk on June 16, 1948, and entered by the presiding judge on June 24, 1948. The supreme court went on to say, at page 299:

> "It is equally clear that a *judgment* exists in this State from the time the court acts even though it may not have been formally written on the record by the clerk. [Citations.] And there is a well-recognized distinction between *rendering* a judgment and *entering* a judgment. The former is the judicial act  * * * the latter is the ministerial act of the clerk  * * *. The terms are used antithetically, each in its distinctive correct legal sense."

The court further added, at page 300:

> "[A] judgment is rendered *when the judge acts*, as a duly constituted court, in declaring his decision of law and pronouncing judgment thereon in open court." (Emphasis supplied.)

Applying those principles in the instant case, the record clearly establishes that the trial judge, acting as a duly constituted court with a deputy clerk present, pronounced in open court the judgment in this case on May 24, 1972. The clerk should have recorded the judgment in the law record book as of May 24, 1972.

In *People ex rel. Schwartz v. Fagerholm* (1959), 17 Ill.2d 131, 137, 161 N.E.2d 20, our supreme court considered the question of when does a judgment become effective. There the court held that at law a judgment becomes effective at the time it is pronounced.

So far as my research is concerned, I have been unable to find a reported case on all fours with the instant case, either before or after the effective date for Rule 272. In Cook County there are many cases, both civil and criminal, for which a written judgment is not filed. When there is no written judgment, I can find nothing in the wording of Rule 272 or the "Committee Comments" which was intended to emasculate the distinction between "judicial" and "ministerial acts." Many of the cases that preceded Rule 272 arose, as did *Freeport* and *Fagerholm*, out of situations created by a judge preparing an order on one date and at one location, then forwarding the said order to the clerk to be filed of record on a different date and location. The problem in the instant case was caused by the clerical or ministerial processing of a judgment on May 25, pronounced in open court on May 24. So far as this record is concerned, the judgment was entered May 24, 1972, and should have been so recorded. However, in the practical application of the majority holding, hereafter a clerk may not enter the judgment in the law record for a period of time longer than one day. I doubt this was intended by Rule 272. If so, then some thought should be given both by the practicing bar

and trial courts of requiring written orders, or in the alternative, there should be a re-examination of the wording of the last sentence of Rule 272.